1              IN THE CIRCUIT COURT

2                    OF

3          MONTGOMERY COUNTY, ALABAMA

4

5      STATE OF ALABAMA,

6           Plaintiff,

7      vs.                    CASE NO:  CC-02-920

8      CHARLES SMITH,

9           Defendant.

10

11

12

13              * * * * * * * * * *

14

15              PROCEEDINGS in the above-styled

16   cause before the Honorable Sally M. Greenhaw,

17   Presiding Judge, in Courtroom 3-C, Montgomery

18   County Circuit Court, 251 South Lawrence Street,

19   Montgomery, Alabama, commencing on Monday,

20   October 28 and Tuesday, November 12, 2002.

21

22              * * * * * * * * * *

23

24        Meridith D. Newman,
          Official Court Reporter
25

1                        **APPEARANCES**

2

3

4           **FOR THE STATE:**

5           Mr. Will Powell
            Montgomery County Deputy District
6               Attorney
            251 South Lawrence Street
7           Montgomery, Alabama  36104

8

9           **FOR THE DEFENDANT:**

10          Mr. Winston Durant
            Attorney at Law
11          445-C South McDonough
            Montgomery, Alabama  36104
12

13

14              *  *  *  *  *  *  *  *  *  *  *

15

16

17

18

19

20

21

22

23

24

25

```
 1                        I N D E X

 2    VOIR DIRE . . . . . . . . . . . . . . . .    7

 3    OPENING STATEMENTS  . . . . . . . . . .     27

 4


 5    STATE'S WITNESS:

 6        LAKESHIA ATKINS
              DIRECT BY MR. POWELL . . . . . . .   38
 7            CROSS BY MR. DURANT  . . . . . . .   61
              REDIRECT BY MR. POWELL . . . . . .   76
 8
          SHONTRICE ROBERSON
 9            DIRECT BY MR. POWELL . . . . . . .   78
              CROSS BY MR. DURANT  . . . . . . .   84
10
          TRUDALE JACKSON
11            DIRECT BY MR. POWELL . . . . . . .   92
              CROSS BY MR. DURANT  . . . . . . .  103
12            REDIRECT BY MR. POWELL . . . . . .  117

13        CORPORAL E. L. JOHNSON
              DIRECT BY MR. POWELL . . . . . . .  119
14            CROSS BY MR. DURANT  . . . . . . .  134
              REDIRECT BY MR. POWELL . . . . . .  140
15
          T. J. KOERNER
16            DIRECT BY MR. POWELL . . . . . . .  143
              CROSS BY MR. DURANT  . . . . . . .  151
17
          CORPORAL THOMAS E. ROBERTS
18            DIRECT BY MR. POWELL . . . . . . .  161
              CROSS BY MR. DURANT  . . . . . . .  167
19
          SERGEANT MATTHEW HIGGINS
20            DIRECT BY MR. POWELL . . . . . . .  173
              CROSS BY MR. DURANT  . . . . . . .  178
21
          DETECTIVE BUTTERBAUGH
22            DIRECT BY MR. POWELL . . . . . . .  181
              CROSS BY MR. DURANT  . . . . . . .  197
23

24    STATE REST . . . . . . . . . . . . . . .   207

25
```

1
2

DEFENDANT'S WITNESSES:

    CHARLES SMITH
3          DIRECT BY MR. DURANT   . . . . . . . 208
           CROSS BY MR. POWELL    . . . . . . . . 218
4

5    DEFENDANT REST  . . . . . . . . . . . . . 225

6    TESTIMONY OUT OF THE HEARING OF THE JURY:

7        DETECTIVE BUTTERBAUGH
           DIRECT BY MR. POWELL . . . . . . . . 233
8          CROSS BY MR. DURANT  . . . . . . . . 236
           REDIRECT BY MR. POWELL . . . . . . . 236
9

10   CLOSING STATEMENTS  . . . . . . . . . . . 237

11   JURY CHARGE . . . . . . . . . . . . . . . 257

12   VERDICT . . . . . . . . . . . . . . . . . 268

13   SENTENCING  . . . . . . . . . . . . . . . 270

14
15
16
17
18
19
20
21
22
23
24
25

1              E X H I B I T S

2    STATE'S EXHIBITS:

3        EXHIBIT NO.  1 -- PICTURE OF DEFENDANT --   133

4        EXHIBIT NO.  2 -- PICTURE OF CEILING TILE - 193

5        EXHIBIT NO.  3 -- PICTURE OF BATHROOM --   193

6        EXHIBIT NO.  4 -- PICTURE OF BATHROOM --   193

7        EXHIBIT NO.  5 -- PICTURE OF BATHROOM --   193

8        EXHIBIT NO.  6 -- PICTURE OF BATHROOM --   193

9        EXHIBIT NO.  7 -- PICTURE OF BATHROOM --   193

10       EXHIBIT NO.  8 -- PICTURE OF TIME-LOCK SAFE  46

11       EXHIBIT NO.  9 -- PICTURE OF BACK DOOR -    53

12       EXHIBIT NO. 10 - PICTURE OF JEEP ---       123

13       EXHIBIT NO. 11 - PICTURE OF JEEP ---       132

14       EXHIBIT NO. 12 - PICTURE OF JEEP INSIDE -- 151

15       EXHIBIT NO. 13  PICTURE OF TWO ITEMS FOUND 176

16       EXHIBIT NO. 14 - PICTURE OF BANK BAG FOUND 167

17       EXHIBIT NO. 15 PICTURE OF PLASTIC BANK BAG 167

18       EXHIBIT NO. 16 - MASK -------           177

19       EXHIBIT NO. 17 - ARBY'S PLASTIC BANK BAG - 188

20       EXHIBIT NO. 18 - ARBY'S PLASTIC BANK BAG - 188

21       EXHIBIT NO. 19 - ARBY'S PLASTIC BANK BAG - 150

22       EXHIBIT NO. 20 - ARBY'S PLASTIC BANK BAG - 188

23       EXHIBIT NO. 21 - SOUTHTRUST BANK BAG --   189

24       EXHIBIT NO. 22 - GLOVES ------          186

25       EXHIBIT NO. 23 - ROUGH MAP -----        165

1    THE COURT:  Mr. Smith, your attorney

2    just indicated that you wanted to say something to

3    the Court.  Now, anything you say could be used

4    against you.  I don't know what you want to say.

5    MR. POWELL:  Before we begin, Judge,

6    we also verified that he is, in fact, does not have

7    three prior felony convictions.  He does have one

8    prior conviction from Jefferson County for armed

9    robbery from 1980 or 1981, in which we have got a

10   certified on, but that's all.

11   THE COURT:  All.  Okay.

12   MR. POWELL:  So he's not looking at

13   a mandatory life without parole like we first

14   looked at.  He's looking at a range twenty to life.

15   THE COURT:  What did you want to

16   tell the Court?

17   THE DEFENDANT:  Oh, yes.  I'm not

18   ready to go to court, because I feel like I have a

19   bond trust -- bridge trust in my attorney.  I would

20   like to get me another attorney.

21   THE COURT:  Mr. Smith, we're --

22   you're going to trial today.  Mr. Durant is a --

23   he's a very good attorney.  He'll represent you

24   well.  And we aren't going to wait just to -- when

25   the jury is standing out there ready to be brought

1    in.  So if you're asking for a motion for a

2    continuance, that's denied.  And motion for another

3    attorney, that's denied.

4         Okay.  Are we ready?

5              MR. DARNEILLE:  Jurors 366 and 378

6    are absent.

7              THE COURT:  And 378?

8              MR. DARNEILLE:  Yes, ma'am.  Are you

9    ready for me to bring them in?

10              THE COURT:  Yes.  If you'll go to

11    the second row right there and go to the end of the

12    row and be seated.  We've got plenty of room, so if

13    you need to spread out, you can.

14         Good morning.  Y'all can be seated.  I'm Judge

15    Sally Greenhaw.  And we're about to start a case.

16    It's a criminal case.  And the name or the style of

17    the case is State of Alabama versus Charles Smith.

18    Mr. Smith is charged with armed robbery in the

19    first degree of LaKeshia Adams, which is alleged to

20    have occurred on April 28th of this year at the

21    Arby's restaurant on Atlanta Highway.  And I'm

22    mentioning that to you, because I'm going to ask

23    you shortly if you know anything or if you've heard

24    anything about the case.

25         But, first of all, I'm going to introduce you

1    to everyone seated at counsel table, and I'll start

2    with Will Powell, he's representing the State

3    today.

4                    MR. POWELL:  Good morning.

5                    THE COURT:  And seated next to him

6    is LaKeshia Adams.  And down at this end is

7    Mr. Charles Smith and his attorney, Winston Durant.

8        And now that I've introduced them to you, I'm

9    going to ask you to introduce yourselves to us.  I

10   know this information is on your questionnaire, but

11   it gives the attorneys an opportunity to put your

12   face with your questionnaire.  When I call your

13   name, if you would please stand.  If you're

14   employed, tell us where.  And if you're married,

15   where your spouse is employed.  Or if you're not

16   working at this time or in school, we need to know

17   that.  And if you're fortunate enough to be

18   retired, the occupation from which you're retired.

19   And if I mispronounce anyone's name, please correct

20   me.

21                    (Roll call was taken.)

22                    THE COURT:  I'm going to be asking

23   some questions and the attorneys will probably have

24   some also.  If anyone needs to respond, if you'll

25   please stand, give your name again -- that has to

1  be on the Record -- and any details that may be

2  helpful.  When I refer to family members, I'm

3  referring to someone in your immediate family:

4  Your spouse, children, grandchildren, brothers,

5  sisters, grandparents.  Or if there's a

6  particularly close friend that you think it would

7  be helpful for the attorneys to have the

8  information about, you can also share that with us.

9      I've introduced you to everyone at counsel

10  table, and I'm going to ask the same question, but

11  not repeat it each time, about each of them, as

12  well as some potential witnesses in the case.  And

13  what I need to know is if you know any of them or

14  related to them by blood or marriage.  And if so,

15  if you'll just stand again, give your name, and

16  maybe how you know them, if it's in the community,

17  in the church, at school, or whatever.

18      Again -- excuse me -- again the State today is

19  represented by Will Powell and seated next to him

20  is LaKeshia Adams.  Anyone know either of them or

21  related to them?

22                  (No response.)

23                  THE COURT:  Okay.  And, again, down

24  at this end is Mr. Charles Smith and his attorney,

25  Winston Durant?

1           (No response.)

2           THE COURT:  And some other

3    witnesses, that they may be called as witnesses,

4    but some of them, their name may just be mentioned,

5    and there are a number of them with the Montgomery

6    Police Department.  And Detective C. J.

7    Butterbaugh?

8           (No response.)

9           THE COURT:  Officer T. J. Koerner?

10          (No response.)

11          THE COURT:  Officer T.  E. Roberts?

12          (No response.)

13          THE COURT:  Officer E. L. Johnson?

14          (No response.)

15          THE COURT:  Officer M. E. Higgins?

16          (No response.)

17          THE COURT:  And also we have

18   Shontrice Robinson -- Roberson?

19          (No response.)

20          THE COURT:  And Trudale Jackson?

21   Anyone know any of them or --

22          (No response.)

23          THE COURT:  Okay.  Does anyone here

24   know or have you heard anything whatsoever about

25   the facts or circumstances of the case?

1                      (No response.)

2                      THE COURT:  I've asked you about

3     people seated at counsel table.  But our DA in

4     Montgomery County is Ellen Brooks.  Anyone know

5     her?

6                      (No response.)

7                      THE COURT:  At any time, if you'd

8     rather not answer a question in front of the rest

9     of the group, we can talk to you in private, so

10    remember that.  And sometimes there's something on

11    your questionnaire -- it may be that they couldn't

12    read your writing -- but attorneys sometimes need

13    to follow up, so we may need to talk to some people

14    in private.

15        I mentioned there are a number of witnesses

16    from the police department.  Would anyone here

17    automatically believe the testimony of a police

18    officer over that of any other witness simply

19    because of that person's position as a law

20    enforcement officer?

21                      (No response.)

22                      THE COURT:  On the other hand, has

23    anyone here had any experiences -- and not just

24    related to the Montgomery Police Department -- but

25    law enforcement, in general, that would cause you

1    to question the testimony of a police officer or

2    not give it credence because of that -- him or her

3    holding that position?

4                     (No response.)

5                     THE COURT:  Does anyone here have

6    any interest whatsoever in the conviction or

7    acquittal of defendant?  Or has anyone made any

8    promises or given any assurances that he or she

9    will convict or acquit?

10                    (No response.)

11                    THE COURT:  Does anyone here have

12   any fixed opinion as to the guilt or the innocence

13   of the defendant which would bias your verdict?

14                    (No response.)

15                    THE COURT:  Has anyone here ever

16   been a victim of an offense such as robbery or has

17   anyone in your family ever been charged with or

18   convicted of an offense such as robbery?  Anyone on

19   the first row, if you want to answer that?

20                    (Juror raises hand.)

21                    PROSPECTIVE JUROR:  I guess it

22   depends on what you call robbery.  I had some stuff

23   stolen from my house.

24                    THE COURT:  Okay.  Well, that would

25   probably be more in the nature of a burglary.

1   This -- robbery is usually on the person -- against

2   the person.

3       Anyone else?

4                   (No response.)

5                   THE COURT:  Well, anyone else, if

6   you've ever been the victim or someone in your

7   family of an offense such as robbery?

8                   (Juror raises hand.)

9                   THE COURT:  On the second row?  And,

10  again, give your name.  She has to take everything

11  down and it's hard to see you if you don't stand

12  up.

13                  PROSPECTIVE JUROR:  Hi.  My name is

14  Suzanne Rugetti, and my children were held up about

15  four years ago, but nothing was ever done.  They

16  were held up by gun.

17                  THE COURT:  Okay.  Was that here in

18  Montgomery County?

19                  PROSPECTIVE JUROR:  Yes, ma'am.

20                  THE COURT:  And no one was ever

21  arrested?

22                  PROSPECTIVE JUROR:  (Nods.)

23                  THE COURT:  And would that cause you

24  a problem with the police that no one was ever

25  arrested?

1          PROSPECTIVE JUROR:  I don't think

2     so.

3          THE COURT:  And I'll ask this to

4     anyone else who responds.  Would that incident

5     cause any problem with your being on this jury,

6     what happened to your children?  Would that, in any

7     way, affect your ability to, if you're selected for

8     this jury, to base your verdict on the evidence

9     presented in the courtroom and the law that

10    applies?

11         PROSPECTIVE JUROR:  I don't think on

12    the evidence, no, ma'am.

13         THE COURT:  Ma'am?

14         PROSPECTIVE JUROR:  I don't think on

15    the evidence.

16         THE COURT:  Okay.  Thank you.

17    Any -- I saw another hand.

18         PROSPECTIVE JUROR:  It was more than

19    twenty years ago, my mother was working as a clerk

20    in the store.  It was an armed robbery.  I don't

21    know what -- I don't know if they ever caught the

22    person or not.  And that was in Lee County.

23         MR. DURANT:  What's your name, sir?

24         PROSPECTIVE JUROR:  John Story.

25         THE COURT:  Thank you.

1    Yes, sir?

2                   PROSPECTIVE JUROR:  About seven

3    years ago, my niece worked at a store and she got

4    shot during a robbery.

5                   THE COURT:  And was that here in

6    Montgomery County?

7                   PROSPECTIVE JUROR:  Yes.

8                   THE COURT:  And, I'm sorry, was

9    anyone arrested or charged with it?

10                   PROSPECTIVE JUROR:  I don't think

11    anybody got caught.

12                   THE COURT:  Anyone else need to

13    respond?

14                   PROSPECTIVE JUROR:  Between ten and

15    fifteen years ago, my grandmother was robbed in her

16    house twice.  And, as far as I know, no one was

17    ever caught.  And that occurred in South Georgia.

18                   THE COURT:  And, again, I'll ask any

19    of you that responded, would -- whatever happened

20    with your relatives, in any way, affect your

21    ability to sit on the jury in this case?

22                   (No response.)

23                   THE COURT:  Sometimes for personal

24    reasons or religious reasons or moral reasons,

25    someone does not think he or she can sit in

1    judgment on their fellow man.  Is there anyone here

2    who would not be able to serve on the jury because

3    of such belief or opinion?

4                    (No response.)

5                    THE COURT:  If you're selected for

6    the jury, if anyone does have any difficulty in

7    hearing or seeing, just let us know, and we'll be

8    sure to place you where you can both hear and see.

9        Mr. Powell?

10                    MR. POWELL:  How are y'all this

11   morning?

12                    (Jurors respond.)

13                    MR. POWELL:  Again, as the Judge

14   said, my name is Will Powell, and I'm representing

15   the State of Alabama here today.  And this is

16   Ms. Atkins.  She worked at the Arby's that was

17   robbed on the night in question.  And she'll be one

18   of the key witnesses, and she'll be here at the

19   counsel table representing Arby's.  Let me start

20   off with this.  Is there anyone that has actually

21   sat on a jury in a criminal trial before?

22                    THE COURT:  And I know that's on

23   your questionnaire.  And if there's something in

24   addition to what you have on your questionnaire is

25   what you need to respond to.

```
 1              Go ahead, Mr. Powell.
 2                    MR. POWELL:  All right.  So we
 3      basically have two folks.  All right.  Do y'all
 4      have a little bit of time?  I know some of you were
 5      here last week -- not all of you were here last
 6      week -- did y'all know anybody before you served on
 7      jury duty?  Do any of y'all know each other or
 8      anything?
 9                    (No response.)
10                    MR. POWELL:  Just checking.
11         Now, this occurred at an Arby's -- I know all
12      have probably eaten at an Arby's.
13                    (Jurors raise hands.)
14                    MR. POWELL:  All right.  Now, what
15      about this particular Arby's out on Atlanta Highway
16      by Eastdale Mall, is there, like, somebody that
17      goes there, like, every day for lunch or, you know,
18      have coffee there every morning or anything like
19      that?
20                    (No response.)
21                    MR. POWELL:  Okay.  Nobody has any
22      particularized or special knowledge of this Arby's
23      specifically?
24                    (No response.)
25                    MR. POWELL:  Okay.
```

1          PROSPECTIVE JUROR:  Sir --

2          MR. POWELL:  Yes, ma'am?

3          PROSPECTIVE JUROR:  Which Arby's is

4    that one?  Is that the one next to Choo Choo's?

5          MR. POWELL:  No, ma'am.  It's on

6    down on the other side of the Boulevard by the

7    mall --

8          That's right, isn't it, Ms. Atkins.

9               (Victim nods.)

10          PROSPECTIVE JUROR:  By Eastdale

11    Mall?

12          MR. POWELL:  By Eastdale Mall, yeah.

13    Okay.  Now, this is an armed robbery case.

14    And we, allegedly, have accused Mr. Smith here of

15    going into the Arby's with a gun and sticking up

16    the people that were in there and that's what we're

17    going to try to prove here today.  But I want to

18    make sure what we're trying to do, is this is our

19    only opportunity that the attorneys have to talk to

20    y'all to ask y'all questions because we're trying

21    to do in this process is make sure we get a fair

22    and unbiased jury that can give both the State and

23    Mr. Smith a fair trial here today.

24        For example, he sits before you presumed

25    innocent.  Like what we have to do, as the State,

1  we have to bring in evidence into this courtroom

2  and put it on through the form of exhibits and

3  testimony through the witness stand to convince

4  y'all beyond a reasonable doubt that he's guilty of

5  what we're saying he did, which, in this case, is

6  armed robbery.  Does everybody, from understanding

7  the concept -- and the Judge will explain a little

8  better -- but just in general terms that he sits

9  here presumed innocent.  Does anyone have any

10  form -- preformed notion, well, they've got him

11  charged, then he's got to be the one who did it?

12              (Jurors nod.)

13          MR. POWELL:  Now, can everyone sit

14  here and listen to just the evidence that we

15  present and make a fair determination of what

16  happened out there at that Arby's on that night?

17              (No response.)

18          MR. POWELL:  Okay.  Now, going along

19  with that, some of the testimony that you're going

20  to hear about in this case is going to be from the

21  police, like Judge Greenhaw said.  So, I just want

22  to get a little more specific.  She asked y'all if

23  y'all would automatically believe a police officer,

24  anybody have any negative experiences with a police

25  officer.  And I just want to kind of be more

1    detailed.  A traffic ticket you didn't agree with.

2    You know, my old partner used to say that his house

3    got burglarized one time, and he didn't like the

4    way the cops came.  And we work in the DA's office.

5    You know, anything like that that I need to know

6    about, that might make you question the testimony

7    of the police officers or anything like that, or

8    any of the other witnesses?

9                    (No response.)

10                    MR. POWELL:  All right.  Thank

11   y'all.

12                    THE COURT:  Mr. Durant?

13                    MR. DURANT:  My name is Mr. Durant

14   and I have -- I just have a couple of questions to

15   ask you.  Can everyone here assure me that they

16   believe in the presumption of innocence, that a

17   person is presumed innocent until proven guilty?

18                    (No response.)

19                    MR. DURANT:  Are there anyone -- is

20   there anyone in here who has a relative who is a

21   police officer?

22                    (Juror raises hand.)

23                    MR. DURANT:  What's your name, sir?

24                    PROSPECTIVE JUROR:  My name is

25   Chiquita Still, and I have an officer -- he's a

1       dispatcher.  He's my uncle.

2                       MR. DURANT:  Chiquita Still?

3                       PROSPECTIVE JUROR:  Yes.

4                       MR. DURANT:  Who else?

5                       PROSPECTIVE JUROR:  Sir, I'm a

6       retired school patrol officer.

7                       MR. DURANT:  Okay.

8                       PROSPECTIVE JUROR:  I forgot to tell

9       her when she asked.

10                      MR. DURANT:  Okay.

11                      PROSPECTIVE JUROR:  I've been

12      retired about --

13                      PROSPECTIVE JUROR:  Yes, my name is

14      Janice Vance.  My brother-in-law is a police

15      officer.

16                      MR. DURANT:  Janice --

17                      PROSPECTIVE JUROR:  Vance.

18                      MR. DURANT:  Okay.

19                      PROSPECTIVE JUROR:  I worked for the

20      Board of Corrections, Draper Work Release about

21      twenty years ago.

22                      MR. DURANT:  You're Mr. --

23                      PROSPECTIVE JUROR:  That's correct,

24      sir.

25                      THE COURT:  And, again, if -- I saw

```
 1    someone stand up.  Just stand up, anyone who needs

 2    to respond, and that way we'll go by rows.

 3                    PROSPECTIVE JUROR:  My name is

 4    Ocie Simmons, and my nephew retired from the police

 5    force.

 6                    MR. DURANT:  Okay.

 7                    PROSPECTIVE JUROR:  I'm Nora

 8    Swedenburg, and I have a cousin that's --

 9                    MR. DURANT:  What's your last name?

10    I'm sorry.

11                    PROSPECTIVE JUROR:  Swedenburg.

12                    MR. DURANT:  Okay.

13                    MR. DURANT:  I have a cousin who is

14    not much older than I am, but he's retired with the

15    police force in Tuscaloosa.

16                    MR. DURANT:  Thank you.

17                    PROSPECTIVE JUROR:  I have a

18    brother-in-law in Tuscaloosa that's a police

19    officer.

20                    MR. DURANT:  And your name?

21                    PROSPECTIVE JUROR:  Anne Petty.

22                    MR. DURANT:  Okay.

23                    PROSPECTIVE JUROR:  I'm

24    Cheryl Thompson, and I have a sister and two

25    brother-in-laws that are retired from the
```

1    Montgomery Police Department.

2                    PROSPECTIVE JUROR:  James Pinkney.

3    I have a brother who is a police officer in Miami.

4                    MR. DURANT:  In Miami?

5                    PROSPECTIVE JUROR:  (Prospective

6    juror nods.)

7                    MR. DURANT:  Okay.

8                    PROSPECTIVE JUROR:  I guess I need

9    to ask a question.  I work with incarcerated

10   individuals at State Technical College.  I don't

11   know if that's the type of questions you're asking,

12   but I am an instructor at the college.

13                    MR. DURANT:  Okay.  And your name?

14                    PROSPECTIVE JUROR:  Carol Smith.

15                    MR. DURANT:  Thank you.

16                    PROSPECTIVE JUROR:  My name is

17   John Stanford.  My sister's husband is retired from

18   the Montgomery City Police.

19                    MR. DURANT:  Thank you.

20                    PROSPECTIVE JUROR:  Elliott

21   Stofferegen.  I have a relative who is a county

22   sheriff.  It's the same last name.  I don't know

23   the details, but you can find out who he is by

24   that.

25                    MR. DURANT:  Okay.  Thank you for

1    your responses.

2         The Judge has asked you this and Mr. Powell

3    has also alluded to it, but it's critically

4    important, because we're going to have quite a few

5    police officers who are going to testify.  And I

6    just want to underscore the importance of that.  So

7    I want to ask you, if any of you would give any

8    more believability to a police officer over a lay

9    person?

10                        (No response.)

11                        MR. DURANT:  Do you understand the

12    question?

13                        (Prospective jurors respond.)

14                        MR. DURANT:  That's all.  Thank you.

15                        THE COURT:  Can I see the attorneys

16    just a minute?

17                        (Bench conference was held.)

18                        THE COURT:  Is there anyone y'all

19    need to talk to?

20                        MR. POWELL:  Your Honor, he's -- no,

21    there's no one.

22                        THE COURT:  We're going to try to

23    have a jury selected by 11:30, so I'm going to

24    release you until 11:30.  And if you'll be in the

25    jury assembly room at that time, we'll let you know

```
 1    who's on the jury, and we'll keep you posted anyway
 2    where we are.  So you're excused until 11:30, and
 3    we'll let you know something then.
 4                    (Out of the presence of the venire.)
 5                    THE COURT:  Okay.  So y'all each
 6    have ten strikes.
 7                    (Striking of the jurors. )
 8                    THE COURT:  This is who I have:
 9    301, 304, 315, 333, 338, 343, 348, 359, 361, 383,
10    393, and 396.
11                    (In the presence of the jury. )
12                    THE COURT:  Yes, ma'am, come on
13    around and go to one of the end of those rows and
14    remain standing.  Before we start, I'm going to
15    swear you in for this particular trial.  I know
16    you've been sworn in earlier.  But I'll ask all of
17    you to raise your right hands.
18                    (Jurors sworn.)
19                    THE COURT:  You can be seated now.
20    Before we start, I'm going to briefly explain to
21    you the procedures that we'll be following and the
22    duties of the Court and the duties of the jury.
23    Now, some of you may have been involved in court
24    proceedings before, but for those of you who have
25    not, I hope it will be helpful.
```

1       First of all, as trial judge, it's my duty to

2   ensure the orderly conduct of the trial, rule on

3   questionss of law as they may arise from time to

4   time.  And, at the end of the case, instruct you on

5   the law that applies.  Now, you as the jury, you

6   are the sole and exclusive judges of the facts.

7   It's your duty to listen to the evidence and from

8   it determine the true facts and then apply the law

9   as given to you by the Court to arrive at your

10  verdict.

11      Now, the procedure that we'll be following is,

12  first of all, counsel for the State will make an

13  opening statement, and then counsel for defendant

14  will respond.  At that time, both sides are

15  confined to a statement of what they expect the

16  evidence to show.

17      Now, these statements, they're not evidence.

18  They're simply given to familiarize you with the

19  case.  Following opening statement, then there will

20  be testimony presented by witnesses from the

21  witness stand and there may also be some exhibits

22  introduced.  During the course of the trial, the

23  attorneys will object from time to time.  That's

24  their job and it's up to the Court to rule on those

25  objections.  But you should not concern yourself

1  with any of the reasons for my rulings as they're

2  controlled and required by law.

3      You're also not to speculate as to any

4  possible answers to questions that are not required

5  to be answered.  In addition, the overruling of an

6  objection is not intended to indicate the weight

7  that will be given such evidence.  Following the

8  close of the evidence, then the attorneys will

9  address you again and make closing statements.

10  And, at that time, they'll discuss the evidence

11  that's been presented and all reasonable inferences

12  to help guide you to your verdict.

13      We'll be taking breaks, and it may depend on

14  where we are with a witness, but if anyone does

15  need to take a break, if you'll just raise your

16  hand, we can do so.  I do want to caution you at

17  this time not to discuss the case with anyone.

18  That includes a fellow juror.  In fact, you're not

19  even to consider the matter until you've heard all

20  of the evidence.

21      At this time -- and also, you're not to go to

22  the scene or anything like that during the course

23  of the trial.  Go ahead.

24          **MR. POWELL:**  May it please the

25  Court, Mr. Durant?

1          Members of the jury, on April the 28th, a

2     little after midnight, this defendant hid in the

3     ceiling tiles of the Arby's restaurant out by

4     Eastdale Mall.  Once, Ms. Atkins and the other

5     employees closed the restaurant, he climbed down

6     from the ceiling, produced a handgun, and then held

7     them all up at gunpoint.

8          At one point, while Ms. Atkins was trying to

9     open a time-lock safe, he had other employees down

10    on their knees, threatening to kill them if she

11    didn't open the safe.  Once he obtained the money,

12    he ran out a back door, and he was subsequently

13    arrested after Ms. Atkins hit the robbery button

14    and the police responded to the scene and caught

15    him after a brief car chase.  That's what this case

16    is about here today.

17         Mr. Smith is charged with armed robbery.

18    That's going into a business or somewhere armed

19    with a gun and taking something by force that

20    doesn't belong to you, in this case, the money from

21    the Arby's and the bank bags that the money was in.

22    And that's what the State has to prove, that this

23    defendant went into that restaurant and used force

24    to take property.

25         If we prove that to you here today, then this

1    defendant is guilty of what, by law, in the State

2    of Alabama, is called Robbery in the First Degree.

3    And what makes it first degree is the fact that not

4    only was force used, but a deadly weapon or a

5    dangerous instrument was used.  So it's force,

6    taking property with a gun, basically, is what we

7    have to prove here today.

8        Now, before we begin, I want to introduce you

9    to Ms. Atkins.  She was the shift manager at Arby's

10    that night.  And they were counting down the

11    registers, cleaning up, other employees --

12    Ms. Robinson was doing the dishes and another

13    employee, Trudale Jackson was in the back, he had

14    just been to the restroom, when this defendant,

15    busted in on them, wearing a mask that covered

16    about half his face with holes cut out for eyes and

17    pointing a gun at Ms. Atkins.  She'll tell you

18    about it.  She'll tell you how he starting

19    demanding wanting to know where the safe was.  They

20    had words.  They had conversation.  She tried to

21    tell him, you know, we don't -- I'll give you the

22    money.  And she will describe to you how he held

23    her at gunpoint until she opened the time-lock

24    safe.  He threatened her so she would not hit the

25    robbery button.  He went in the back and got the

1   other employees out of the back.

2       Ms. Robinson and Mr. Jackson will tell you how

3   he put them down on their knees and held the gun on

4   them while they were waiting for this time-lock

5   safe to open.  And then once he had the money,

6   she'll tell you that this armed man in the mask had

7   some very distinctive features.  One of the things

8   about him was that he was wearing a green shirt,

9   scrubs, like hospital scrubs.  The other thing --

10  that's different from here in the courtroom

11  today -- he had a very distinctive mustache, and

12  you'll see a photograph of that.  Because they

13  could get a mask on, but they could see the bottom

14  half of his face.  The mask was just from here up,

15  so they could see everything down here and they

16  could see his eyes, but he just had the mask over

17  the top of his head.  That's what the witnesses

18  will tell you.

19      Then Mr. Jackson, after he left the

20  restaurant, went out into the parking lot.  Once he

21  went out the back door, Ms. Atkins was able to hit

22  the robbery button -- the alarm button, the police

23  responded.  And the police officer car -- Oficer E.

24  L. Johnson was nearby, and Mr. Jackson was able to

25  go there -- that's the guy right there.  He was

1    getting away in a white Jeep Cherokee, because

2    that's going to be important.  Ms. Roberson saw the

3    Jeep Cherokee.  Mr. Jackson saw the Jeep Cherokee.

4    Two of the three Arby's employees identified a

5    white Jeep Cherokee.  And when the police responded

6    to the scene, Mr. Jackson was like there he goes,

7    that's him.  So Mr. Johnson -- Officer Johnson gave

8    chase.  So that's where we are.

9         He headed up the Boulevard until other patrol

10   units became involved.  They led them all around.

11   The patrol officers will tell you the route they

12   took.  We've got maps, we'll show -- we'll go over

13   all that in detail.  But, basically, what it

14   amounted to is after several patrol units got

15   behind and he led them on a -- kind of a mild

16   chase, they stopped and arrested him.

17        Now, once they arrested him, they found a bank

18   bag from Arby's inside the jeep he was driving.

19   Now, after they arrested him -- they also found

20   some gloves inside the jeep he was driving -- and

21   the witnesses will tell you that he was wearing

22   gloves at the time -- so that's what they found

23   inside the jeep, a bank bag and some gloves.  All

24   right.  What about the gun?  What about other

25   property they took?  Well, part of this chase went

1    through Gunter Park over off Coliseum Boulevard

2    over there.  The police backtracked through various

3    portions of the chase, and they found on the side

4    of the road where the defendant had thrown stuff

5    out the window, they found other bank bags and they

6    found the mask that he had been wearing.  One of

7    the K-9 officers -- a dog was out there sniffing

8    around looking for evidence.  They were trying to

9    find the gun.  They never located the gun.  But

10   they did find other bank bags that had Arby's

11   written on it and the mask that he was wearing

12   where he had started throwing stuff out the window

13   during the police chase.

14       Now, that's going to be the State's evidence

15   in this case.  You've got witnesses that saw

16   distinctive things on this individual at the scene.

17   Patrol officers that chased him.  He was caught

18   with a bank bag in his car.  And they go back and

19   backtrack over the chase route, and they find stuff

20   where he had been throwing the stolen money and the

21   stolen bank bags out the window.

22       Now, they never recovered the gun.  How can we

23   convict somebody of armed robbery if he didn't have

24   a gun?  Well, the witnesses say he had a gun when

25   he was in the restaurant.  And it will be up to you

1   whether you believe them or not.  And I think that

2   after you hear all the testimony in this case, it's

3   going to be clear that this defendant hid in those

4   ceiling tiles at Arby's, pulled a gun on these

5   people while they were cleaning up from a long day,

6   long shift at work, and tried to rob that Arby's.

7   Luckily, the police were there and he was caught

8   redhanded.  And, at the and of this trial, we're

9   going to ask you to find the defendant guilty of

10  Robbery in the First Degree.

11      Thank you.

12              MR. DURANT:  May it please the

13  Court, Mr. Powell?

14      You have heard the -- the opening statement of

15  the District Attorney.  And as the Judge has just

16  instructed you or told you that our statements are

17  not evidence.  It's just what we think the evidence

18  is going to show.  And his statement, obviously, is

19  going to be portrayed as more favorable to the

20  prosecution.

21      One of the things I usually say to jurors in

22  opening statement is that I want you to have a very

23  open mind.  Because if -- after you've heard that

24  statement, if you were not open minded, well, then,

25  my client would automatically be convicted.  It's

1    that simple listening to what the District Attorney

2    had to say.  So, it's very important that you keep

3    an open mind until you hear all of the evidence

4    presented.  And that is why I ask you about the

5    presumption of evidence -- presumption of

6    innocence.  Because presumption of innocence is a

7    very, very critical part of any criminal case.  It

8    is critical because it is evidence -- that's what

9    it is.  What I'm saying right now is not evidence.

10   But presumption of evidence -- innocence is

11   evidence.  And why?  Because the constitution of

12   the United States says so.  It says that any person

13   charged with an offense is presumed to be innocent.

14   And that presumption -- that presumption follows

15   that individual all the way into that jury room.

16   And it's only until you have deliberated and you

17   have analyzed the evidence and dissected the

18   evidence.  And if you find that the State has

19   proven its case beyond a reasonable doubt, only

20   then, does that presumption of innocence goes out.

21   But that presumption -- and the Judge is going to

22   instruct you when this case is concluded that

23   presumption of innocence abides -- it abides

24   throughout.

25        Now, you heard the District Attorney say that

1    Mr. Smith was wearing a mask.  Well, that alone

2    would indicate that as far as identification is

3    concerned, it's going to be questionable in this

4    case.  He has said that there's going to be some

5    distinct -- some distinctive things that witnesses

6    are going to testify to, and that is why, you know,

7    I employ you to keep an open mind, because you have

8    to listen to the testimony.  Listen to see whether

9    those witnesses are, in fact, going to testify to

10   any distinctive traits or characteristics of the

11   defendant that would tie the defendant into this

12   case.

13        You have heard that the -- according to the

14   District Attorney that when the jeep was stopped,

15   there was some money found in the jeep.  Now, that

16   is something that you're going to have to determine

17   ultimately.  Whether, in fact, money was found in

18   the jeep; whether, in fact, the bags that were

19   disposed of, as he was -- as he continued on his

20   way, ignoring the police, emergency equipment

21   warnings; whether he, in fact, threw those bags out

22   the window, and whether, in fact, the officers had

23   the ability to see someone at night throw bags out

24   of the window.  Those are things that you have to

25   determine.  And it's only by listening to the

1   witnesses and examining what they have said after

2   you have started a deliberation, would you be able

3   to determine whether, in fact, these things

4   happened.

5        My client is going to testify.  And that is

6   something, you know -- it's also very important in

7   this case -- and that's why, again, in voir dire, I

8   asked you whether -- and the Judge asked you --

9   whether you would believe a police witness over a

10  lay witness, because that's very important, because

11  people tend to believe a person in uniform.  And

12  that is not exactly the case all of the time that

13  that person is credible.  So you -- I ask you to

14  keep a very open mind as the testimony comes in in

15  this trial and throughout this trial as you hear

16  the testimony from all of the witnesses and from my

17  client.

18       And let me just -- let me just say -- let me

19  just add this.  As this case goes along, we might

20  decide not to call my client.  It all depends.

21  But, again, you're not to draw any inference from

22  that, because we don't have to put on any case.

23  He's charged, and they have to prove their case.

24  We don't have to put on a case.  And that is how

25  strong the presumption of innocence is, that we

1    don't have to put something -- anyone on the stand,

2    if we think that the case is not that strong.

3         So, again, you know, I, in closing -- in

4    ending this closing statement, I -- we have -- we

5    have questioned you.  We have examined your

6    questionnaire, and I think that we have a good

7    jury -- a fair-minded jury, the best that we can

8    pick -- all of us can pick, the defense and the

9    District Attorney.  And I think you would then --

10   after you've heard all of the evidence, I think you

11   will enter a just verdict.  Thank you very much.

12                    THE COURT:  Mr. Durant, come up

13   here.

14                    (Bench conference was held.)

15                    THE COURT:  I'm going to give you a

16   longer lunch break that you'll normally get.  But

17   we don't want to just start with a witness and

18   immediately stop.  And I'm going to give you until

19   1:30, because I actually have a conference call at

20   1:15.  So we'll get you in the jury assembly room

21   at 1:30.  And, again, you can't talk about it.  So

22   we'll see you at 1:30.

23                    (Lunch break was taken.)

24                    THE COURT:  Good afternoon.  You can

25   be seated.

1    And are you ready with your first witness?

2              MR. POWELL:  We are, Your Honor.

3    Your Honor, State calls LaKeshia Atkins.

4              THE COURT:  And if you'll raise your

5    right hand?

6                   LAKESHIA ATKINS

7        The witness, having first been duly sworn or

8    affirmed to speak the truth, the whole truth, and

9    nothing but the truth, testified as follows:

10             THE COURT:  Let me say before she

11   starts, you may see the law clerk bringing in some

12   papers.  There's always something for me to sign,

13   and I may be working on an order on my computer.  I

14   hope it's not disruptive, but I'm certainly going

15   to be paying close attention to the trial.  But if

16   you're in trial every day all week, you get far

17   behind on that paperwork.

18       Go ahead.

19                 DIRECT EXAMINATION

20   BY MR. POWELL:

21       Q.   Could you state your name for the members

22   of the jury?

23       A.   LaKeshia Atkins.

24       Q.   And could you speak up for me so --

25       A.   LaKeshia Atkins.

```
1          Q.    If you need to scoot up, feel free to.

2          A.    (Witness complies.)

3          Q.    Now, Ms. Atkins, where were you employed?

4          A.    At Arby's.

5          Q.    Are you still employed there?

6          A.    Yes, sir.

7          Q.    And were you employed there back in April

8    of this year?

9          A.    Yes, sir.

10         Q.    And, specifically, I want to call your

11   attention to the night of April 28th.  Do you

12   remember that night?

13         A.    Yes, sir.

14         Q.    Did something unusual happen?

15         A.    Yes, sir.

16         Q.    Just begin at the beginning.  On your --

17   obviously, in your own words, tell us what happened

18   that night.

19         A.    Okay.  Um --

20               THE COURT:  Can all of you hear her?

21               (Jurors nod.)

22         A.    Okay.  On that particular night, you

23   know, I was the closing manager, of course.  And I

24   had locked all the doors, you know.  Did my

25   routine -- you know, nightly routine.  You know,
```

40

1      going through the -- the restaurant and making sure

2      no one's in there.

3              Q.    What time do y'all usually close?

4              A.    We usually close at eleven o'clock.  It

5      all depends on whether it's Friday and Saturday --

6      Friday or Saturday.  And I don't remember whether

7      that night was a Friday or Saturday, but we --

8      well, after we -- you know, we were closed and

9      everything.  I locked all the doors.  You know, and

10     I did my -- you know, just walked in to see if

11     anyone is in the bathroom stalls and everything and

12     just turned around and walked out.

13             Q.    You checked the bathrooms?

14             A.    Right.

15             Q.    Did you see anyone in any of the

16     restrooms?

17             A.    No.

18             Q.    You checked both the mens and the womens?

19             A.    I checked the mens and womens, just

20     walked in and turned around and walked out.

21             Q.    Didn't do any extensive checking or

22     anything?

23             A.    No.

24             Q.    Didn't poke up in the ceiling tiles?

25             A.    No.

1      Q.    Okay.  Please continue.  What happened

2  next?

3      A.    Okay.  I proceeded to do my paperwork.  I

4  counted all -- you know, counted all the registers

5  down and secured all my money.  And I, you know,

6  began to do my paperwork and everything.  We have

7  this little thing -- this report that runs off the

8  register, it's called a hundred report.

9      Q.    A hundred report?

10     A.    Uh-huh.

11     Q.    Okay.

12     A.    And I was beginning -- you know, I had

13  almost finished all my paperwork.  You know, and

14  she was folding that up and getting that prepared

15  so I could take everything back to the back to my

16  computer, so I could put everything in.  And then

17  all of a sudden, the door opens and this gentleman

18  flies in with a gun in his hand and tells me don't

19  say a word.  He said, Don't say a word.  And I

20  didn't let out a loud scream or anything.  I was

21  just startled, you know.  And he was, like, come

22  on, go with me.  Go with me.  He was like, where is

23  some money?  I was, like, I don't have the money.

24  And he was, like, Come on.  And --

25                THE COURT:  We need more question

1    and answer.  She has to take it down.  It's hard

2    when --

3                    MR. POWELL:  Yes, Judge.

4         Q.    Now, you say he busted in on you with a

5    gun?

6         A.    Right.

7         Q.    Can you describe it for me?

8         A.    I don't know.  It was just a little

9    silver gun.

10        Q.    Okay.

11        A.    It was a little gun.

12        Q.    Is there any doubt in your mind that he

13   was armed with a gun?

14        A.    No.

15        Q.    Now, how many other people were in the

16   store with you at that time?

17        A.    Two other people.

18        Q.    Other employees?

19        A.    Right.

20        Q.    And what were their names?

21        A.    Trudale and Shontrice.

22        Q.    Shontrice?

23        A.    Right.

24        Q.    What happened once he pulled the gun on

25   you and told you -- asked you where the money was?

1        A.    We went -- okay.  We have two -- we have

2    an old safe and we have a new safe.  The new safe

3    is a time-lock safe and the other safe is where you

4    use a combination and everything.  He led me

5    straight around there.

6        Q.    Before we go further into detail.  Kind

7    of set -- you say he came in some doors.  Describe

8    the restaurant --

9        A.    Okay.

10        Q.    -- for me.  Like, where you are and --

11    are you in an office or --

12        A.    I'm behind the front counter.  Okay.  If

13    you're standing, you know, behind the front

14    counter --

15        Q.    Uh-huh.

16        A.    -- you walk -- the doors are right here.

17        Q.    The doors behind the counter?

18        A.    The doors to the restaurant is right

19    here.  And there's a door right here.  That's the

20    door that comes behind the counter.

21        Q.    Okay.

22        A.    You know, customers don't ususally enter

23    into through that door, just employees.  It's an

24    employee entrance.

25        Q.    And is that the door he came through?

1     A.    That's the door he came through.

2     Q.    Okay.  And then where did he take you?

3     A.    He took me -- okay.  You see the front --

4  it's like a front counter right here, and then you

5  go -- go around, you know, the fryers and shake

6  machine right there and go around and that's our

7  little office back there.  And that's where the

8  computer is and everything.

9     Q.    All right.

10     A.    And he took me around there.

11     Q.    And then what happened?

12     A.    Then he -- he proceeded to open that

13  safe.

14     Q.    The new one or the old one?

15     A.    The old one that was back there in the

16  office space.  And he began to pull everything out

17  of it and asked me where the money was, and I told

18  him it was in there.  He was, like, you hid the

19  money.  I know you did.  Where is it?  I said, it's

20  not back here.  I told him it was up front.  He

21  was, like, come on.

22        So we went back up front to the front counter,

23  you know, where the time-lock safe is, you know,

24  where we have to -- the -- it's a time-lock safe,

25  and it's five minutes for each little seconds to

1    open.  And I explained that to him.

2                    THE COURT:  Wait just a minute.

3    Again, let's have more question and answer.

4                    MR. POWELL:  Yes, Judge.

5                    THE COURT:  And just listen to his

6    question and don't go further than necessary.  And

7    then he'll follow up.  And it's easier for her to

8    take things down that way.

9                    THE WITNESS:  Okay.

10        Q.    Before we go any further about the safe,

11   I'm going to show you what's been marked as

12   State's 8.  Do you recognize that?

13        A.    Uh-huh.

14        Q.    What is it?

15        A.    This is our time-lock safe.

16        Q.    That's the safe where he actually got the

17   money out of?

18        A.    Right.

19        Q.    Is that a fair and accurate

20   representation of the safe?

21        A.    Uh-huh.

22                    MR. POWELL:  Your Honor, we offer

23   State's 8.

24                    THE COURT:  Okay.  Admitted.

25                    (State's Exhibit No. 8 was admitted

1                    into evidence.)

2        Q.    Now, describe for the jurors how this

3   safe works.

4        A.    Okay.  There's two doors on that safe.

5   There's a little door at the top and then there's a

6   big door that you open -- that you actually open

7   the safe.  And then there's a little door that's

8   inside it.  And the little door has, you know,

9   where we deposit our bags and everything.  And the

10  big door is where we put our registers and our

11  petty cash for daily operation.

12       And each one of them is five minutes to open.

13  So it takes five minutes to open each one.  You put

14  a code in, you select which door you want to open,

15  and it takes five minutes for it to actually prompt

16  you to put your code in again to open the safe.

17       Q.    Did you do that?

18       A.    Yes.

19       Q.    Did you have the code?

20       A.    Yes.

21       Q.    Did you explain to him that it was going

22  to take some time to get into the safe?

23       A.    Yes, I did.

24       Q.    Okay.  What happened during the five

25  minutes while y'all were waiting?

1      A.    By the time we got back to the front

2    counter, one of the other employees spotted him.

3      Q.    Who was that?

4      A.    Trudale.  And he told me to stay right

5    here, and he went over there and got him.  And he

6    told me, I know you pushed that button --

7                    MR. DURANT:  Objection.

8                    THE COURT:  Okay.  Just -- you need

9    to ask more questions.

10      Q.    That's all right, Ms. Atkins.  I know

11    you're nervous.  Just take a deep breath.  All

12    right.  He went and got Trudale.  What did he say

13    to you?

14      A.    He told me not to push that button.

15      Q.    Now, when you say not to push that

16    button, what button are you talking about?

17      A.    We have a button we push to -- it's a

18    silent alarm, but I didn't know whether it was

19    going to go off or what.  I didn't bother pushing

20    it, because --

21      Q.    Where is it in relation to State -- this

22    safe --

23      A.    It's --

24      Q.    -- in State's 8?

       A.    This little white box here.

```
1          Q.    This little part right here?

2          A.    Uh-huh, that little white box.

3          Q.    This white box right here?

4          A.    Uh-huh.

5          Q.    That's the silent alarm?

6          A.    Uh-huh.

7          Q.    And he told you not to push that?

8          A.    Right.

9          Q.    And then what did he do once he told you

10    don't push the alarm?

11         A.    He went back to get Trudale.

12         Q.    And then what happened?

13         A.    He told him to get down.

14         Q.    Did Trudale get down?

15         A.    Yeah.

16         Q.    You saw this?

17         A.    Right.

18         Q.    How?  Describe it for us.

19         A.    I was already down in front of the safe.

20         Q.    You were down already?

21         A.    Uh-huh.

22         Q.    Were you laying on your stomach?

23         A.    No, I was just sitting there on my knees

24    with my hands on my knees.  And, you know, he went

25    around to the back to get him.  And he told him to
```

```
 1    get down and he put the gun to his head, and he
 2    said, If you push that button, I'm going to shoot
 3    him.
 4         Q.   He said that to Trudale?
 5         A.   He said, I'm going to kill him.  I'm
 6    going to shoot him.
 7         Q.   And he physically put the gun up to his
 8    head?
 9         A.   To his head.  And he put his arm -- he
10    had the gun and his hand, his arm, and he was,
11    like, this.  You know, he had his arm on his
12    shoulder, and he told him to get -- you know, he
13    had the gun in his hand, and he was, like, you
14    know --
15         Q.   What happened?
16         A.   -- I'm going to shoot him.
17         Q.   Then what happened?
18         A.   Then I proceeded to put the code in -- in
19    the safe.
20         Q.   And that's what y'all were doing the five
21    minutes while you wait?
22         A.   Uh-huh.
23         Q.   Probably seemed like longer than five
24    minutes?
25         A.   Uh-huh.
```

1          MR. DURANT:  Objection.

2          THE COURT:  Sustained.

3      Q.   Ms. Atkins, what happened next?

4      A.   As we sat there and waited, I think I --

5  I think I got the registers out -- the big one had

6  opened already, so that gave me -- I had gotten

7  that one out already.  He was telling Trudale --

8  told me to pull those registers out --

9          MR. DURANT:  Objection.

10          THE COURT:  Overruled -- are you

11  saying --

12      Q.   The defendant?

13      A.   The defendant.  I'm sorry.

14          THE COURT:  Okay.  Overruled.

15      Q.   What did the defendant tell you to do

16  with the registers?

17      A.   He told me to pull them out.

18      Q.   And did you?

19      A.   I pulled them out one by one.

20      Q.   And did what?

21      A.   And I put them on the floor, and he told

22  me to slide them to him, and I slid them to him.

23      Q.   Then what?

24      A.   I was, you know, beginning to get the

25  money out of the register.  And he said, no.  You

```
 1     don't do that.  You let him do that.  He was
 2     talking to -- talking about Trudale.  And then, by
 3     that time, Shontrice came around.
 4          Q.   Okay.  And then what did he do once
 5     Shontrice came around?
 6          A.   He made her get down too.
 7          Q.   So now all three of you are down there?
 8          A.   Uh-huh.
 9          Q.   And Trudale is loading the money?
10          A.   Right.
11          Q.   What's he loading it into?
12          A.   We had a little blue -- blue zipper bag
13     that had, like -- already, like, our petty cash in
14     it.
15          Q.   I'm going to show you State's 21.  Do you
16     recognize that?
17          A.   Uh-huh.
18          Q.   What is it?
19          A.   Our little petty cash bag.
20          Q.   Okay.  Is this the little blue zipper bag
21     you were just referring to?
22          A.   (Witness nods.)
23          Q.   So he's loading money in the blue zipper
24     bag?
25          A.   Right, Trudale is.
```

1        Q.    Were there any money bags?

2        A.    Yeah.  We had a little safe, you know, I

3   was putting the code in for that, you know, so, we

4   could -- for this little safe right here.

5        Q.    Show me.

6        A.    (Witness complies.)  Right here.  You

7   have to put another code in.

8        Q.    You're pointing to the top of State's 8?

9   Did you put the code in the top part of it?

10       A.    No.  It's -- you still have to do it from

11  here.

12       Q.    Okay.

13       A.    So you have to push, you know, you want

14  door number two to open.

15       Q.    Okay.

16       A.    And you have to wait five more minutes.

17       Q.    Were there other bank bags up there?

18       A.    Uh-huh.

19       Q.    And after that five minutes, did that

20  part of the safe open?

21       A.    Yeah.

22       Q.    What happened then?

23       A.    He grabbed the bags.  And he made us lay

24  on the floor -- me and Shontrice, he made us lay on

25  the floor.  And he got Trudale, and he made him

1    lead him to the back out the back door.

2        Q.   Now, I'm going to show you State's 9.  Do

3    you recognize this?

4        A.   Uh-huh.

5        Q.   What is it?

6        A.   It's our back door.

7        Q.   Is that a fair and accurate picture of

8    that back door?

9        A.   Uh-huh.

10               MR. POWELL:  Your Honor, we offer

11   State's 9.

12               THE COURT:  Admitted.

13               (State's Exhibit No. 9 was admitted

14               into evidence.)

15       Q.   And is this --

16               THE COURT:  And, for the Record,

17   would you say yes or no?

18               THE WITNESS:  Yes, ma'am.

19       Q.   Okay.  This is the back door to the

20   restaurant?

21       A.   Yes, sir.

22       Q.   Is this where he went out?

23       A.   Yes, sir.

24       Q.   Now, there's a bar in this photograph

25   down toward the floor --

1        A.   Right.  It's on the floor on top of that

2  cardboard box.

3        Q.   What's that bar?

4        A.   It's the, you know, the security door to

5  keep -- to make sure that it is locked.

6        Q.   Did he have to move that bar to get out

7  the door?

8        A.   Yes, he did.  We -- he, normally, at

9  night, once we lock all the rest of the doors, we

10  make sure that bar is on there and that door is

11  locked too.

12        Q.   Now, I want to talk to you for a minute

13  about the other money bags besides the blue one he

14  got when you opened the second part of the safe.

15  What did those bags look like?

16        A.   They're white plastic bags.

17        Q.   Okay.  Now, I'm going to show you State's

18  20 -- 17, 18, 19, and 20, and ask you if you

19  recognize these.  Take a second to look at those.

20        A.   Uh-huh.

21        Q.   Do you recognize those?

22        A.   (Witness nods.)

23        Q.   How?

24        A.   These are our nightly deposit bags.  We

25  put all of our cash in there.  After each shift, we

1    usually have three for each shift or whatever.

2        Q.    And do each one of those, State's 17, 18,

3    19, and 20, do they say Arby's on them somewhere?

4        A.    Yes, they do.

5        Q.    Could you hold that up so the jury can

6    see?

7        A.    This one has Arby's right here.  And

8    Arby's right here.  And this one has Arby's right

9    here and right here.

10       Q.    All right.

11       A.    And this one has Arby's on this line

12   where it says -- (inaudible).  And this one has

13   Arby's right here and right here.

14       Q.    And these were full of money?

15       A.    Right.

16       Q.    And just so we know, the money has been

17   returned to the restaurant?

18       A.    Right.

19       Q.    Okay.  Only the bank bags were kept in

20   evidence; is that right?

21       A.    Uh-huh.

22       Q.    And do you have any idea of the total

23   money that was taken from the store that night?

24       A.    No, I don't.

25       Q.    Was it just a few dollars or --

1          A.    I wasn't a few dollars, no.

2          Q.    How -- give me a guesstimate.

3                    MR. DURANT:  Objection.

4                    THE COURT:  Sustained.  You can

5    rephrase it.

6          Q.    Several thousand dollars?

7          A.    Right.

8          Q.    Now, I want to talk a little bit -- did

9    you ever see the man again after -- you,

10   specifically, after Trudale let him out the back

11   door.

12         A.    No, I did not.

13         Q.    Did you ever see the vehicle he was

14   driving in?

15         A.    No, I didn't.

16         Q.    You didn't?

17         A.    No.

18         Q.    Now, what was this -- describe this

19   individual that was in the store for us as best you

20   can remember.

21         A.    I say he was about medium height.  He was

22   like a round guy, and he had on a -- he had the

23   mask on.  The only thing I remember is that he had

24   the mask on.  He had his eyes and mouth cut out

25   with the mask on, and he had, like, white cotton,

1  like white sock gloves.

2      Q.   Now, I'm going to show you what I've

3  marked as State's 16.  Do you recognize this?

4      A.   Uh-huh.

5      Q.   What is this?

6      A.   That -- it looks like the one he had on.

7      Q.   Do you -- is this the mask you saw in the

8  store that night?

9      A.   He had it on.

10     Q.   Is there anything about this that would

11  refresh -- I mean, that makes it specific to that

12  night?

13             MR. DURANT:  Objection.

14             THE COURT:  Overruled.

15     A.   You know, the little part right here cut

16  out.

17     Q.   Did he have any distinctive facial

18  features or anything?

19             MR. DURANT:  Leading, objection.

20             THE COURT:  Overruled.

21     A.   He had a mustache.

22     Q.   Do you remember anything about the

23  clothing he was wearing or anything unusual?

24     A.   The green-like hospital scrubs.  And he

25  had on, like, some black shoes.  That's all I

1    remember.

2        Q.    Now, I'm going to show you what I've

3    marked as State's Exhibit 1, which is a photograph

4    of the defendant.

5                MR. DURANT:    Objection.

6                (Bench conference was held.)

7                MR. DURANT:    I'm going to object to

8    this photograph identification, because if he had

9    on a mask, there was no way he could have seen his

10   face --

11               THE COURT:    I don't know that he's

12   going to ask her to identify the face.

13               MR. POWELL:    Just the shirt and the

14   mustache like she's identified to.

15               THE COURT:    I'll let you ask

16   questions about those.    You can make it clear as --

17               (In the hearing of the jury.)

18       Q.    Now, I'm going to represent to you that

19   that's the photograph taken of the defendant.    Is

20   there anything that you recall from State's 1 that

21   you saw on the person that came in the restaurant

22   that night?

23       A.    This shirt.    He had this shirt and that

24   color.    And I could, you know, with the mask on, I

25   could see his eyes and, like, this part right here.

1        Q.   Is that the same kind of mustache as the

2  individual that held you at gunpoint?

3        A.   Uh-huh.

4              THE COURT:  You need to say or --

5              THE WITNESS:  Yes, sir.  I'm sorry.

6        Q.   From the part of his face you could see,

7  does that match what --

8              MR. DURANT:  Objection.

9        Q.   -- that defendant looks like in that

10  photograph?

11              THE COURT:  Overruled.

12        A.   Yes, sir.

13        Q.   Is there any doubt in your mind that the

14  person that held you at gunpoint was wearing a

15  hospital scrub shirt?

16        A.   No, sir, not at all.

17        Q.   Did that strike you as unusual?

18              MR. DURANT:  Objection.

19              THE COURT:  Sustained.

20        Q.   Now, I'm going to show you State's 22.

21  You said something about he was wearing something

22  on his hands --

23        A.   Uh-huh, white gloves.

24        Q.   I'm showing you State's 22.  Does this --

25  do you recognize that?

1       A.    Uh-huh.

2       Q.    How?

3       A.    He had them on his hands.

4       Q.    Okay.   You remember seeing these gloves

5   that night?

6       A.    Yeah.

7       Q.    And just real briefly, Ms. Atkins, I'm

8   going to show you these photographs of the restroom

9   area, State's 2, 3, 4, 5, 6, and 7.   These are

10  photographs of various areas in that restroom that

11  you checked.   Do you recognize all these?

12      A.    Not that.

13      Q.    Not No. 3?

14      A.    No.

15      Q.    Okay.   What about No. 2?

16      A.    4.   This is like the rail inside the

17  bathroom stall.

18      Q.    Okay.   And No. 2 is a photograph of the

19  ceiling tile?

20      A.    Correct.

21      Q.    And No. 3 is a photograph of the rail on

22  the side of the stall?

23      A.    No --

24              THE COURT REPORTER:   That's 4.

25              MR. POWELL:   4,excuse me.   Thank

1    you, Mrs. Newman.

2         A.    Five is the floor.

3         Q.    Okay.

4         A.    And 6 is the --

5         Q.    The urinal?

6         A.    The men's urinal, yeah.  And 7 is the

7    floor.

8         Q.    And all of these photographs were taken

9    inside your restaurant?

10        A.    Right.

11                MR. POWELL:  Okay.  I don't think I

12   have anything further at this time, Judge.

13                      CROSS-EXAMINATION

14   BY MR. DURANT:

15        Q.    Good afternoon, Ms. Atkins?

16        A.    Good afternoon.

17        Q.    Did you say this was around 11 p.m. that

18   evening?

19        A.    It was after.

20        Q.    It was after.  What time do you -- what

21   time does the store usually close?

22        A.    The store usually close at 11.

23        Q.    So this was somewhere --

24        A.    Monday through Thursday at 11.

25        Q.    -- between 11:00 and 11:30?

62

1      A.   What was that?

2      Q.   This was sometime between 11:00 and

3  11:30?

4      A.   I think so.

5      Q.   You think so?

6      A.   I'm not sure exactly what time it was.

7      Q.   Okay.  But it wasn't 12?

8      A.   I don't know what time it was.  But it

9  was after we closed.

10      Q.   And you close at 11?

11      A.   Right.

12      Q.   And did -- is it your responsibility when

13  you are -- at closing time, on that particular

14  evening, for you to make your rounds and make sure

15  that everything is in order, as far as the security

16  of the facility is concerned?

17      A.   Yes, it is.

18      Q.   Okay.  And you said that you went to the

19  men's and the women's bathroom?

20      A.   Yes, I did.

21      Q.   And you didn't see anything that was out

22  of place?

23      A.   No, sir, I didn't.

24      Q.   You didn't?

25      A.   No, sir.

1    Q.    Did you -- what kind of --

2    A.    I didn't -- I just make sure that I would

3    see a body --

4    Q.    Okay.

5    A.    -- in the restaurant.

6    Q.    So what you do -- or what do you do, you

7    just go through and open the bathroom doors?

8    A.    Open the bathroom door.

9    Q.    Do you look in the stalls?

10   A.    Look in the stalls.  You know, if I don't

11   see anybody, turn around and walk out.

12   Q.    You actually walked into the -- did you

13   actually walk into the --

14   A.    Stall, no.

15   Q.    No.  No.  No.  No.  Did you actually walk

16   into the bathroom --

17   A.    I --

18   Q.    -- as opposed to just opening the door

19   and making a -- taking a glance?

20   A.    No, I didn't.

21   Q.    You didn't walk in?

22   A.    No.

23   Q.    Okay.  But you were satisfied when you

24   looked in there that you did not see anyone?

25   A.    Yes, sir.

1    Q.    Did you look up in the ceiling?

2    A.    No, sir.

3    Q.    If there were some ceilings -- if there

4    were ceilings stuff that were displaced and

5    consequently they would be on the floor of the

6    bathroom; isn't that correct?  You identified some

7    of these -- some of these -- for example,

8    Exhibit 3 --

9              MR. DURANT:  May I approach, Judge?

10             THE COURT:  Sure.

11   Q.    -- and it's obvious that something has

12   been ripped out; is that correct?

13   A.    Um, I didn't say that I recognized that.

14   I don't know what that is.

15   Q.    You don't know what that is?

16   A.    No.  I assumed it's part of the ceiling.

17   Q.    Part of the ceiling?

18   A.    Yeah.

19   Q.    Okay.  You didn't see anything on the

20   floor?

21   A.    I wasn't --

22   Q.    You didn't see any debris on the floor?

23   A.    I didn't see a person.  That's what I was

24   looking for, a person.

25   Q.    Yeah, but if the -- if the ceiling was

1     displaced or broken -- for someone to get up in the

2     ceiling, it had to be some damage done to the

3     ceiling; isn't that correct?

4     A.    Perhaps, I guess.

5     Q.    Pardon me?

6     A.    Perhaps, you know.

7     Q.    And if there were damage and if there

8     were debris -- well, consequently, it would -- it

9     would be manifested on the floor -- the floor of

10    the bathroom,; isn't that correct?

11    A.    Probably would.

12    Q.    And if you looked in there, did you see

13    any debris?

14    A.    I didn't look for debris.  I wasn't

15    looking for debris.

16    Q.    Well, I'm not asking if you looked for

17    any debris.  I'm asking if you saw --

18    A.    I'm saying, if I wasn't looking for it,

19    then I -- I just know that the bathrooms need

20    cleaning.  We clean the bathrooms after we close.

21    Q.    Well, Ms. Atkins, you don't have to look

22    for something to find something if it is in

23    clear --

24    A.    I wasn't paying attention to that.

25    Q.    So you don't know whether there was any

1    debris there or not?

2         A.    I do not know.

3         Q.    You were not suspicious that someone was

4    up in the ceiling, were you?

5         A.    No, sir, I wasn't.

6         Q.    Where -- where did this person come from?

7    You were at the counter, right?

8         A.    Right.

9         Q.    Is that correct?

10        A.    Right.

11        Q.    You were at the counter?

12        A.    On the front counter.

13        Q.    Yes.  And you were doing some paperwork

14   as you testified to in direct?

15        A.    Yes, sir.

16        Q.    And this person came out of no where or

17   did -- can you detail to the ladies and gentlemen

18   of the jury what path this person took to come to

19   you?

20        A.    The only thing that I can think of is

21   that he came through the employee door.  The door

22   that comes -- that you enter to get behind the

23   counter.

24        Q.    Okay.  And is this employee door somewhat

25   attached to the front counter?

```
 1         A.    Somewhat, maybe.

 2         Q.    And -- when someone comes into the

 3    Arby's --

 4         A.    Right.

 5         Q.    -- and -- the front counter is there,

 6    right?

 7         A.    Right.

 8         Q.    And say this is the front counter.

 9         A.    Right.

10         Q.    Where is the employee's door situated in

11    relation to the person coming off the street

12    into -- onto the premises.  You have to go around

13    the corner.

14         Q.    Okay.

15         A.    It's in the same hallway where the

16    restaurant doors are.

17         Q.    It's the same hallway?

18         A.    Right.

19         Q.    And where were the other employees during

20    this time.

21         A.    They were in the back.

22         Q.    They're in the back.  Could they see you?

23         A.    They could see me.

24         Q.    They could see you?

25         A.    Well, Trudale could see me.
```

1    Q.    And is this Shondriese?

2    A.    She could see me if she looked -- you

3  know, turned around and looked.  You know, there's

4  a little space between --

5    A.    Uh-huh.

6    Q.    -- where you could see from the front to

7  the back.

8    Q.    So when this person came in and held a

9  gun to you, this person said, you know -- what did

10  the person say?

11    A.    He told me not to say anything.

12    Q.    Okay.  And you -- obviously you complied?

13    A.    Yes, sir.

14    Q.    And what was the next thing you did or

15  what was his next command?

16    A.    The next command was come on.

17    Q.    Do what?

18    A.    He said, Come on.

19    Q.    Okay.  And where did you go?

20    A.    He pushed me toward -- to the other side

21  of the restaurant -- to the other side of the front

22  counter?

23    Q.    The other side?

24    A.    Right.

25    Q.    So you were to one side, and he pushed to

1    to the other side?

2        A.    Right.

3        Q.    And the safe -- the safe we're talking

4    about, was that located at the other end of the

5    counter?

6        A.    Right, on the other side at the other end

7    of the counter.

8        Q.    Okay.  And how many safes, two or one?

9        A.    Two safes.

10       Q.    Okay.  And they're right there together?

11       A.    No, sir.

12       Q.    Okay.  Where is -- could you tell --

13   could you explain to me where they're located?

14       A.    Okay.  On the front counter -- you have a

15   front counter here, and there's one safe right

16   here.

17       Q.    Okay.

18       A.    And then you go on around, and there's

19   another safe around the counter in the little

20   office space area.

21       Q.    Is that the time that you --

22       A.    The time-lock safe is on the front

23   counter.

24       Q.    On the front counter, right, okay.  Did

25   you go to the other counter first -- to the other

1   safe first?

2        A.    Yes, sir.

3        Q.    Why, because he told you to?

4        A.    Yes, sir.

5        Q.    Okay.  And did he tell you to open the

6   safe?

7        A.    No, sir.

8        Q.    Okay.  Why did you come back to the other

9   counter -- the other safe -- I'm sorry.

10       A.    Because he asked me where the money was

11  and --

12       Q.    Okay.  Do you keep any money in the other

13  safe?

14       A.    No, sir.

15       Q.    You said that the -- it takes about five

16  minutes to open each drawer?

17       A.    Each safe, yes, sir.

18       Q.    Each safe.  And how many safe --

19       A.    There's two.

20       Q.    There are two.  Okay.  And it takes five

21  minutes to open it?

22       A.    Each one.

23       Q.    I thought I understood you -- did you not

24  testify on direct that you -- you have to do

25  something to -- the combination.  And one, it takes

1    five minutes to pull out a drawer or --

2        A.    No.  You have to put your code in.

3        Q.    Uh-huh.

4        A.    It takes five minutes after you select

5    which drawer you want to open.  From the time you

6    select a door, you put, you know, it starts

7    counting from then.

8        Q.    It takes five minutes from that door?

9        A.    Right.

10       Q.    How many doors are on this counter?

11       A.    Two.

12       Q.    So it took a total of ten minutes to open

13   the entire safe; is that right?

14       A.    Yes, sir.

15       Q.    Okay.  And there was -- there were money

16   bags in both of them; is that correct?

17       A.    There was money bags in the small safe.

18       Q.    In the small safe.

19       A.    There was a little -- a little bag in the

20   small safe, but it was, you know, daily petty cash.

21       Q.    But you opened that also?

22       A.    Yes, sir.

23       Q.    And when was it that -- when you were

24   opening the safe, did any of the other employees

25   come out front?

1      A.   Shontrice came up front.

2      Q.   Shontrice was the first person to come up

3 there?

4      A.   Shontrice was -- no, she was the last

5 person to come up there.

6      Q.   Okay.  So Trudale came up front first.

7      A.   He went and got Trudale.

8      Q.   He went and got him.  What were you doing

9 at that time.

10     A.   I was sitting down.  I was on my knees in

11 front of the safe.

12     Q.   Okay.  And -- then he got Trudale and he

13 pointed a gun --

14     A.   Yes, sir.

15     Q.   He pointed a gun at him?

16     A.   Yes, sir.

17     Q.   Do you know whether -- before he got

18 Trudale, do you know whether Trudale had observed

19 what was going on?

20     A.   I'm not sure -- well, he looked up and

21 saw -- Trudale saw him, and he went back and got

22 him.

23     Q.   Okay.  Did you -- did you give a

24 statement to the police?

25     A.   Yes, sir.

1     Q.    Did they take a -- did they take an

2   audiotape?

3     A.    Yes, sir.

4     Q.    Did they?

5     A.    Yes, sir.

6     Q.    And did you -- did you review it?

7     A.    Briefly.

8     Q.    Because of the so-call -- because of the

9   so-called mask that this person was wearing, you

10  couldn't identify this individual, could you?

11    A.    Not exactly -- not his entirely facial

12  features, you know, exactly.  I could only see his

13  eyes and I could see the mustach he had.

14    Q.    But you couldn't say whether it was me or

15  that gentleman sitting over there?

16    A.    No, sir.

17    Q.    Could you?

18    A.    No, sir.

19    Q.    Okay.  And you couldn't make an

20  identification of the -- because of the

21  identification of his eyes, you could not -- you

22  could not make a leap and say, Well, this is the

23  person --

24    A.    No, sir.

25    Q.    -- robbing?

```
 1          A.    No, sir.

 2          Q.    That is not correct?

 3          A.    I could not.

 4          Q.    Okay.  Did you see the -- did you see

 5   when this person left the store?

 6          A.    No, sir.

 7          Q.    You didn't see that.  And did I

 8   understand you to say that Trudale opened the door?

 9          A.    Trudale -- all I know is Trudale went to

10   the back.

11          Q.    But you don't know --

12          A.    He led him.  I don't know exactly what he

13   did.

14          Q.    When did you -- when did you press the

15   button -- when was the first time you pressed the

16   button?

17          A.    After I felt like I was out of his sight.

18          Q.    Okay.  So that was some fifteen minutes

19   or so after this person held you up, fifteen or

20   twenty minutes, is that fair?

21          A.    Perhaps.

22          Q.    When -- how long did it take for the

23   police officers to arrive after you pressed the --

24          A.    I have no idea.

25          Q.    You have no idea?
```

```
 1            A.   No.

 2            Q.   Five, ten, fifteen minutes -- okay.

 3     That's all right if you don't recall.  Did -- when

 4     the officers arrived, did they talk to you right

 5     away?

 6            A.   Yes, sir.

 7            Q.   They asked you what had happened?

 8            A.   Yes, sir.

 9            Q.   Okay.  Who was the first officer to speak

10     with you, do you recall his name?

11            A.   No, sir, I don't.

12            Q.   He came into the store, or you went

13     outside?

14            A.   He came into the store.

15            Q.   Okay.  And that's the first officer you

16     saw?

17            A.   Yes, sir.

18            Q.   Did he -- did he subsequently leave the

19     store?

20            A.   No, sir.

21            Q.   He stayed with you --

22            A.   He stayed with us.

23            Q.   -- until you went downtown?

24            A.   Yes, sir.

25                 MR. DURANT:  That's all.
```

```
 1                REDIRECT EXAMINATION
 2   BY MR. POWELL:
 3        Q.   Ms. Atkins, when you hit the robbery
 4   button, where does the alarm go?  Who does it
 5   notify?
 6        A.   The police.
 7        Q.   Is it instantaneous?
 8        A.   I'm not exactly sure how it works.  All I
 9   know, you know --
10        Q.   You hit that button and the police know
11   to come?
12        A.   Right.
13        Q.   Fair enough.  When you were checking the
14   store going in those bathrooms and stuff, was there
15   any way anyone could have come outside the store
16   inside the store?
17        A.   No, sir.
18        Q.   So for someone to have walked through
19   that employee door and startled you, they would
20   have already been in the restaurant --
21                  MR. DURANT:  Objection.
22                  THE COURT:  Wait.  I didn't hear all
23   the question.  If you would repeat it?
24        Q.   So for someone to have walked through
25   that employee door and startled you, they would
```

1  have already been inside the restaurant after y'all

2  closed?

3       A.   Yes, sir.

4       Q.   But you do remember seeing the green

5  scrub shirt on that individual?

6       A.   Yes, sir.

7       Q.   And he had the mustache?

8       A.   Yes, sir.

9       Q.   And is he more the size and shape of

10  Mr. Durant or more the size and shape of the

11  defendant?

12       A.   More the size and shape of the defendant.

13            MR. POWELL:  Nothing further.

14            MR. DURANT:  No further questions.

15            THE COURT:  Okay.  You can step

16  down.

17            (Witness excused.)

18            THE COURT:  Your next witness?

19            MR. POWELL:  State calls

20  Ms. Roberson.

21            THE COURT:  If you'll have a seat

22  right up there and raise your right hand?

23            SHONTRICE ROBERSON

24       The witness, having first been duly sworn or

25  affirmed to speak the truth, the whole truth, and

```
1    nothing but the truth, testified as follows:
2                    DIRECT EXAMINATION
3    BY MR. POWELL:
4         Q.   If you would, would you scoot up to that
5    microphone so we can hear you?
6         A.   (Witness complies.)
7         Q.   Would you state your name for the members
8    of the jury?
9         A.   My name is Shontrice Roberson.
10        Q.   And how old are you, Ms. Roberson?
11        A.   Eighteen years old.
12        Q.   And back in April of this year, where
13   were you working?
14        A.   At Arby's on the Atlanta Highway.
15        Q.   Do you still work there?
16        A.   No, I do not.
17        Q.   Now, I want to go back, specifically, to
18   I believe it was April 28th of this year.  Do you
19   recall anything unusual happening right around
20   closing time that night?
21        A.   Yes, it was very quiet while we was
22   closing.  And, normally, while we close, it was
23   real noisy and active, but not that night.  It was
24   just quiet.
25        Q.   Who all was in the restaurant with you,
```

1    if you recall?

2        A.    It was me, my manager, and another

3    employee.

4        Q.    Do you remember the other employee's

5    name?

6        A.    Yes.  LaKeshia and Trudale.

7        Q.    And is this your manager?

8        A.    Yes.

9        Q.    Ms. Atkins?

10       A.    Yes.

11       Q.    And the other individual's name was

12   Trudale Jackson?

13       A.    Yes, sir.

14       Q.    And what were you doing that night?  What

15   was your role in closing that restaurant?

16       A.    Making sure all the dishes get washed and

17   to sweep and to mop the floor.

18       Q.    Had you -- had you gotten to the sweeping

19   and the mopping yet?

20       A.    No, sir.  I was still washing dishes.

21       Q.    Now, what happened while you were washing

22   dishes?

23       A.    I turned around to take some dishes up

24   front, and a guy was in front of me and told me to

25   come with him.

1      Q.   And then what happened.  I had went up

2   front with him, and I saw my manager was kneeling

3   on the floor and also my other employee.  And I was

4   told to kneel on the floor also.

5      Q.   So when you were led up front and your

6   manager, Ms. Atkins was already kneeling on the

7   floor?

8      A.   Yes, sir.

9      Q.   And the other -- Trudale was already

10  kneeling on the floor?

11     A.   Yes, sir.

12     Q.   Okay.  What happened then?

13     A.   Um, he -- the man was rushing Ms. Atkins

14  to open up the safe, but it took time.  You had to

15  sit there and wait for it to open properly.  And

16  the fellow said -- told -- said to me that -- he

17  told me, Don't worry.  But if she don't hurry up

18  and open this safe, I'm going to shoot his head

19  off.

20     Q.   Did he have something to shoot with?

21     A.   Yes.

22     Q.   What?

23     A.   A gun.

24     Q.   What kind of gun was it?

25     A.   I don't know what kind of a gun was it,

1    but I know it was a gun.

2         Q.    Is there any doubt in your mind at all

3    that he had a gun that night?

4         A.    No, there's no doubt.

5         Q.    He had a gun?

6         A.    Yes, sir.

7         Q.    And when you say he said he was going to

8    shoot his head off, who was he talking to?

9         A.    Trudale.

10        Q.    Was he pointing the gun at anyone?

11        A.    He was pointing it mostly at Trudale at

12   his back and his head.

13        Q.    What happened next?

14        A.    After that, she got the safe open, and he

15   was telling Trudale to put the money in the bag --

16   in the little safe bag.  And Trudale kept sliding

17   it into the safe bag.

18        Q.    Then what happened?

19        A.    Then he asked where the exit was, and him

20   and Trudale got up and went to the back where the

21   exit was.

22        Q.    Did you see anything after that?

23        A.    No, I just see them leave.

24        Q.    You saw them leave?

25        A.    Out the back door.

1    Q.    Now, was there -- what was he wearing

2    that night, the person that had the gun?

3    A.    Like a hospital scrub shirt and a mask

4    like --

5    Q.    Now, I'm going to show you State's 16.

6    Do you recognize this?

7    A.    Yes, sir.

8    Q.    What is it?

9    A.    It's like a -- it could be a hat with

10    holes poked in it.

11    Q.    Okay.  Does this look like the mask he

12    had on that night?

13    A.    Yes, because it fit his face.

14    Q.    How was he wearing it?

15    A.    Pulled over his head with the eyes coming

16    from each hole and the mouth going through the

17    bottom.

18    Q.    Now, could you see his mouth?

19    A.    Yes.

20    Q.    Could you see anything about his face

21    that was unusual?

22    A.    He had a thick mustache.

23    Q.    Describe it for us.

24    A.    It was kind of dark and full and had a

25    little grayish in it also.

1        Q.    And you recall a hospital scrub shirt?

2        A.    Yes, sir.

3        Q.    And I'm going to show you State's Exhibit

4    No. 1.  Do you recognize that?

5        A.    Yes.

6        Q.    What do you recognize about State's 1?

7        A.    The hospital shirt, the color.

8        Q.    Is that the same color of the shirt of

9    the individual that came in the restaurant that

10   night with the gun?

11       A.    Yes, sir.

12       Q.    Did the individual that had the gun, did

13   he have anything on his hands?

14       A.    Um, I think some gloves.

15       Q.    Describe them for me.

16       A.    It was, like, kind of oldish, like, maybe

17   white.

18       Q.    I want to show you State's 22.  Do you

19   recognize anything in State's 22?

20       A.    Those look familiar.

21       Q.    Could those be the gloves?

22       A.    Yes, sir.

23       Q.    But do you know for sure?

24       A.    No, not off recollection.

25       Q.    But he was wearing something on his

1    hands?

2        A.   Yes, sir.

3        Q.   Okay.  Did you see any cars or anything

4    leaving the restaurant after the robbery happened?

5        A.   Well, when I went to the drive-through

6    window to look out to see if I could see anything,

7    I saw a jeep.

8        Q.   A jeep?

9        A.   Yes, sir.

10       Q.   What color was it?

11       A.   It was white.

12       Q.   All right.  I'm going to show you

13    State's 10.  Do you recognize that?

14       A.   Yes, sir.

15       Q.   What's that a picture of?

16       A.   A jeep.

17       Q.   Does that look like the same jeep you saw

18    that night?

19       A.   Yes, sir.

20       Q.   Okay.

21           MR. POWELL:  I don't think I have

22    anything further right now, Judge.

23              CROSS-EXAMINATION

24    BY MR. DURANT:

25       Q.   Good afternoon, Ms. Roberson.

```
 1          A.    Good afternoon.

 2          Q.    What were your hours at that particular

 3    Arby's -- what were your hours of work?

 4          A.    It varied different times.

 5          Q.    Okay.  What was the shift on this

 6    particular night?

 7          A.    Five to close.

 8          Q.    Five to closing?

 9          A.    Uh-huh.

10          Q.    And do you recall what time it was that

11    evening?

12          A.    No, I do not.

13          Q.    But it was after eleven o'clock?

14          A.    Yes, sir.

15          Q.    And the first time you knew that

16    something was wrong was when you got ready to take

17    some dishes up front?

18          A.    It -- when we closed, it was very quiet.

19    But, normally, when we close we're either talking

20    to each other, but for that night it was quiet.

21    And when I turned around --

22          Q.    Let me --

23          A.    -- the man was in my face.

24          Q.    Let me ask you this.

25          A.    Go ahead.
```

1    Q.    About how long was it -- you said, it's

2    usually, you know, people are talking.  Your best

3    estimate, how -- about how long was it quiet?

4    A.    I don't know, because I was washing

5    dishes.

6    Q.    It was quiet for the entire duration of

7    the closing?

8    A.    No, sir.

9    Q.    It wasn't?

10   A.    No, sir, not the entire.

11   Q.    So there was some talking before?

12   A.    Yeah.

13   Q.    And then suddenly it got quiet?

14   A.    Yes, sir.

15   Q.    When you came up front, did the person

16   say anything to you?

17   A.    He told me to kneel next to Trudale.

18   And, like I said before, what caught my eye -- my

19   ear was that he said, If she doesn't -- don't

20   worry -- because I was starting to cry and breathe

21   fast -- and he said, Don't worry, but unless she

22   doesn't hurry up and open the safe up, he was going

23   to shoot his head off.

24   Q.    Okay.  And he was pointing it to

25   Mr. Trudale?

1    A.   Yes.

2    Q.   You just -- you just testified that you

3  went to the drive-through; isn't that correct --

4    A.   After.

5    Q.   -- and looked outside?

6    A.   After that had happened.

7    Q.   After -- after you felt he had left and

8  you were no longer in danger; is that right?

9    A.   Yes.

10   Q.   And you said you saw a jeep?

11   A.   Yes, sir.

12   Q.   Okay.  Was the jeep moving or was it

13  stationary or standing?

14   A.   It was stationary.

15   Q.   It was stationary?

16   A.   Yes.

17   Q.   Did you see anybody run to the jeep?

18   A.   No, sir.

19   Q.   About how long after the person had left

20  the premises did you see the jeep still standing?

21  Do you understand my question?

22   A.   No, sir.

23   Q.   Okay.  The person left the restaurant; is

24  that correct?

25   A.   Correct.

1     Q.    And then you went -- subsequently, you

2     went to the drive-through?

3     A.    Uh-huh.

4     Q.    And you saw the jeep?

5     A.    Yes, sir.

6     Q.    About how long -- time had lapsed?

7     A.    I don't know.

8     Q.    You don't know?

9     A.    Huh-uh.

10     Q.    How far was the jeep from the restaurant?

11    Could you give an estimate, using this courtroom,

12    from where you're sitting to the back of the

13    courtroom?

14     A.    About that length, I would say.

15     Q.    Pardon me?

16     A.    About that length, I would say.

17     Q.    That length?

18     A.    Yes, sir.

19     Q.    You're sure of that?

20     A.    I'm positive.

21     Q.    Okay.  You didn't see the jeep leaving?

22     A.    No, sir.

23     Q.    You didn't stand there for any time?  You

24    just took a glance?

25     A.    No.  I looked out the window, because

```
1    Trudale went out the front door to see too.  And I
2    said, there's one back that away.
3        Q.    Okay.  Let me just ask you this.  Trudale
4    accompanied the person to the back door; is that
5    correct?
6        A.    Yes.
7        Q.    And after he went out of the back door,
8    Trudale came back towards the front; is that
9    correct?
10       A.    That's correct.
11       Q.    And that's about the same time you were
12   looking out the drive-through; is that correct?
13       A.    Yes.
14       Q.    And that's when you observed the jeep?
15       A.    Yes, sir.
16       Q.    And the jeep wasn't moving?
17       A.    (Witness nods.)
18       Q.    Where was it parked in relation to the
19   drive -- the drive-through?
20       A.    Towards the back.
21       Q.    Towards the back?
22       A.    Uh-huh.
23       Q.    Okay.  Was it in line -- directly in line
24   of where people usually come in to get -- to the
25   drive-through?
```

1    A.    I don't understand your question.

2    Q.    Was the -- was the jeep parked away from

3  the drive-through, you know, in terms of -- if the

4  jeep moved where you saw it --

5    A.    Uh-huh.

6    Q.    -- would it be coming towards the

7  drive-through?

8    A.    It can go -- if a car was parked out

9  there, it can go drive-through or on the other

10  side.

11    Q.    Okay.  But -- you didn't observe that --

12  you didn't observe that vehicle leave the --

13    A.    No.

14    Q.    Okay.  Could you identify Mr. Smith here

15  in court as the person who robbed that store?

16    A.    No -- I could tell if he had a mustache.

17    Q.    Pardon -- you could tell if he had a

18  mustache?

19    A.    Uh-huh.

20    Q.    But you could not conclude from the fact

21  that he had a mustache that that was the gentleman

22  sitting there?

23    A.    Well, the hair.

24    Q.    Uh?

25    A.    His hair.

1      Q.    Yeah, but -- did he have braids that

2    night?

3      A.    Huh-uh.

4      Q.    Pardon me?

5      A.    No.

6      Q.    He didn't have braids?

7      A.    No, sir.

8      Q.    Okay.  So what is it about the hair that

9    you could identify?

10      A.    It was thick.

11      Q.    Okay.  But you couldn't see his face?

12      A.    Just his eyes and his -- he had a very

13    thick mustache, and he had a beard.

14      Q.     Okay.  But you couldn't say that that was

15    the same person who was in the store?

16      A.    Huh-uh.

17                 MR. DURANT:  Okay.  Thank you.

18                 MR. POWELL:  Nothing further, Judge.

19                 THE COURT:  Okay.  You can step

20    down.  And is she excused?

21                 MR. POWELL:  Yes.

22                 THE COURT:  Okay.  You can stay or

23    leave.

24                 THE WITNESS:  Okay.

25                 (Witness excused.)

1      THE COURT:  And if you would raise

2  your right hand.

3              TRUDALE JACKSON

4      The witness, having first been duly sworn or

5  affirmed to speak the truth, the whole truth, and

6  nothing but the truth, testified as follows:

7              DIRECT EXAMINATION

8  BY MR. POWELL:

9      Q.   Would you state your name for the jury?

10     A.   Trudale Jackson.

11     Q.   Now, Mr. Jackson, back in April of this

12  year, where were you working?

13     A.   At Arby's on Atlanta Highway.

14     Q.   On Atlanta Highway?

15     A.   Correct.

16     Q.   Did something unusual happen to you at

17  that Arby's right around closing time on the

18  April 28th?

19     A.   Correct.

20     Q.   What happened?

21     A.   We was -- after I had just got through

22  cleaning the bathrooms, I went to the back.  And

23  when I was coming back up towards the front, I

24  looked across the counter, and I seen this guy had

25  my manager at gunpoint.  And then he looked around

1    at me and pointed the gun at me.  He ran around and

2    came and grabbed me.  And I just -- and then --

3         Q.    We'll stop right there.  I'll ask you

4    some questions.  Which bathroom were you coming out

5    of?

6         A.    The men's bathroom.

7         Q.    The men's bathroom?

8         A.    Yeah.

9         Q.    When you were in the bathroom, had you

10   seen anything unusual --

11        A.    No.

12        Q.    -- in the bathroom?  Now, when did the

13   man see you?

14        A.    When -- when I looked over the back line

15   counter to look up through the front --

16        Q.    Uh-huh.

17        A.    -- that's when he spotted me.  And that's

18   when he turned around with the gun and pointed it

19   at me.

20        Q.    What kind of gun did he have?

21        A.    It was a small silver handgun.  It was

22   something like a .25 or a .30.  It was a little

23   small hand pistol.

24        Q.    Any --

25        A.    It was silver.

1    Q.    Any doubt, in your mind, that he had a

2    gun there that night?

3    A.    Yeah, he had a gun.

4    Q.    What did he do with the gun?

5    A.    Oh, he had a gun.  He was pressing the

6    gun to my head.  He was also pressing it in my side

7    constantly.

8    Q.    What -- where did he make you go?

9    A.    When he first -- well, when he first came

10   and got me, he grabbed me and made me go around up

11   to the front where my manager was.  He got me and

12   my -- the co-worker, she didn't even see him come

13   back there and get me.  He got me and brought me

14   around there.  That's when he was pressing the gun

15   in my head and my side, telling me that he was

16   going to shoot me if the safe didn't open.

17   Q.    Did he make you kneel down?

18   A.    Yes.

19   Q.    Were you and your manager there kneeling

20   at gunpoint while y'all were waiting for the safe

21   to open?

22   A.    Yes.

23   Q.    Then what happened?

24   A.    Then the co-worker, she walked around to

25   the front.  And she seen him, so she hollered.  And

1    that's when he grabbed her and also brought her

2    down on her knees next to me.

3         Q.    Now all three of you are down there?

4         A.    Correct.

5         Q.    What happened next?

6         A.    Sir?

7         Q.    What happened next?

8         A.    Okay.  The -- we were still waiting on

9    the safe to open.  While the safe was opening, he

10   was constantly telling us that he was going to

11   shoot us if the safe doesn't open.  If he hears

12   anything, he was going to shoot.  So, finally, the

13   safe opened.  When the safe opened, he told me to

14   get the money and put it in the bags.

15        Q.    Did you do that?

16        A.    Yeah.

17        Q.    What kind of bag were you putting the

18   money in?

19        A.    It was a blue bank bag.

20        Q.    I'm gong to show you State's 21.  Is this

21   the bag?

22        A.    Correct.

23        Q.    Okay.  Continue.  What were you doing

24   with the money?

25        A.    I was stuffing the money in the bag.  So

1    after I stuffed that money in the bag, there was

2    another safe inside that safe.  And he said --

3    because it hadn't open yet.  So he kept saying that

4    if the other safe don't open, he's going to shoot.

5    So, finally, the safe opened.  And it was the

6    little small white bags, he got them and told me

7    just to ram them up together.

8         Q.    I'm showing you State's 18.

9         A.    Correct.

10        Q.    Did the bags look like this?

11        A.    Yes.

12        Q.    After he had all these bank bags, what

13   did he do?

14        A.    He told me -- no, he asked was there a

15   key to the back door to get out.  And we was, like,

16   no, it's got a bar on it.  So he then told me to

17   get up to go back -- to walk in the back with him

18   to open the door.

19        Q.    Did you go with him?

20        A.    Yeah.

21        Q.    What happened?

22        A.    He -- he had grabbed me by my right

23   shoulder, and I was walking, kneeling down like

24   this.  And he had the gun toward my side.  And, as

25   we were walking toward the back, he told me to

1    stop.  And when he stopped, he got the money and

2    stuffed the money down his pants.  And then he told

3    me -- when he finally made it to the door -- the

4    door has a bar on it -- he told me to lift the bar

5    on the door.  When I reached to lift the bar,

6    that's when he pushed me to the side and went out

7    the back door.

8         Q.   Is it -- and that's when he left the

9    restaurant?

10        A.   Yeah, correct.

11        Q.   Now, what did you do after he ran out.  I

12   ran around to the front and asked my -- and told my

13   manager that he was gone.  And she was then on the

14   phone, so I ran out the front door.

15        Q.   When you ran back to the front, she was

16   already on the phone?

17        A.   Yeah, she was --

18        Q.   And then --

19        A.   No, she was getting up --

20        Q.   Uh-huh.

21        A.   She was getting up as I was -- because I

22   was taking my time to get out the door.  So when I

23   did get out the door, I was running toward the

24   back.

25        Q.   Okay.

1        A.    And I didn't see no one in the back.

2        Q.    Then what happened?

3        A.    I ran to the other side, the one the

4   drive-through window was on.  And I -- I heard when

5   the door shut, but I didn't see where it was coming

6   from.  It was in the parking lot.  So then the K-9

7   unit, he was circling the parking lot.  By then, he

8   had --

9        Q.    Let me stop you right there.  When you

10  say you heard a door shut --

11       A.    Uh-huh.

12       Q.    What kind of door are you talking about?

13       A.    It was a car door.

14       Q.    You're not talking about the back door to

15  the restaurant?

16       A.    No, huh-uh.  It was a car door.

17       Q.    You heard a car door shut?

18       A.    Yeah, because I was in the parking lot.

19       Q.    You're outside the restaurant?

20       A.    Outside the restaurant.

21       Q.    You run outside?

22       A.    Yeah.

23       Q.    Okay.  What happened after you heard this

24  car door shut?

25       A.    The K-9 unit then seen me standing out --

1    because I was out flagging or whatever, because I

2    seen them circling the parking lot in the back.  So

3    he --

4         Q.   When you say K-9 unit --

5         A.   Uh-huh.

6         Q.   -- you're talking about a police car?

7         A.   Yeah.

8         Q.   Was it a regular police car?

9         A.   No.  It was a jeep -- black jeep.

10         Q.   With a dog?

11         A.   With a dog, correct.

12         Q.   And you saw that police jeep?

13         A.   Uh-huh.

14         Q.   What did you do?

15         A.   I was flagging him towards me.

16         Q.   And what happened?

17         A.   He came -- he came up there, and he

18    was -- he had had his window down, and he was

19    looking at me.  And he was asking me what was going

20    on.  I said, we just got robbed.  We just got

21    robbed.

22         Q.   What are you wearing at this point?

23         A.   My Arby's uniform.

24         Q.   So what did you tell the police officer?

25         A.   I was telling them I was an employee for