VOl 1002

COURT OF CRIMINAL APPEALS NO. **CR-02-0327**

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

### FROM

CIRCUIT COURT OF _Matgomery_ COUNTY, ALABAMA

CIRCUIT COURT NO. _CC-02-920_

CIRCUIT JUDGE _Truman Hobbs_

Type of Conviction / Order Appealed From: _Robbery I_

Sentence Imposed: _20 yrs._

Defendant Indigent: ☒ YES ☐ NO

_Charles Smith_
NAME OF APPELLANT

_Kelly Vickers_ _669-0700_
(Appellant's Attorney)               (Telephone No.)
_P.O. Box 230803_
(Address)
_Montgomery_ _Al_ _36123_
(City)        (State)        (Zip Code)

V.

## STATE OF ALABAMA

NAME OF APPELLEE

(State represented by Attorney General)
NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

(For Court of Criminal Appeals Use Only)

A

1   stop signs doing at least fifty miles an hour or

2   so.

3        Q.   And during this time -- during this time,

4   as best as you can recall, were there other

5   vehicles out there --

6        A.   (Witness nods.)

7        Q.   -- or -- go ahead and answer.

8        A.   I understand.  No traffic whatsoever.

9        Q.   No traffic?

10       A.   No traffic.

11       Q.   And it was after midnight?

12       A.   Yes, sir.

13       Q.   And you said the county -- there was a --

14   was the county sheriff involved in this

15   coordination?

16       A.   No, sir, he wasn't.  The county, they

17   also sometimes will listen to our radio traffic.

18   Hackle Drive was right up to the Northern

19   Boulevard.  And what the county did -- unit did,

20   they positioned themselves right there at Hackle

21   and the Northern Boulevard, so it was about a block

22   down from where he eventually stopped.  But he was

23   blocking the street at that point.  And that's when

24   he pulled over.  He simply pulled onto Hackle and

25   he saw it was blocked.

1    Q.    And -- and you said you exited your car

2    and immediately drew your firearm, right?

3    A.    Yes, sir.

4    Q.    And you ordered him to get out of the

5    car?

6    A.    Yes, sir.

7    Q.    And you said there was some hesitation?

8    A.    Yes, sir.

9    Q.    What was he doing?

10    A.    I couldn't -- I couldn't quiet see

11    because the windows are somewhat a light tint,

12    light enough to where I couldn't quiet see.

13    Q.    But -- about how many seconds expired

14    before he came out?

15    A.    I would say five to six seconds.

16    Q.    And that's not -- that's not a long time,

17    is it?

18    A.    When you're in a situation like that, it

19    seems like an eternity, yes, sir.

20    Q.    People react that way, you know -- you've

21    been an officer for over three years, right?

22    A.    Uh-huh.

23    Q.    People sometimes hesitate, because

24    they're afraid, don't they?

25    A.    Some situations they may.

1      Q.    If you seen ten, fifteen police cars

2   converging on a scene, you might --

3      A.    From my experience, if -- when ten,

4   fifteen, you know, patrol cars are converging on

5   one person, generally they cooperate right away.

6   He was hesitant to cooperate right off the bat.

7      Q.    Okay.  But he was coming out?

8      A.    Eventually, yes, sir, he did.  He raised

9   his hand and did come out cooperative,

10     Q.    After -- after his arrest was secured,

11  how long -- you testified, did you not, that you

12  searched the jeep; isn't that correct?

13     A.    Yes, sir.

14     Q.    And how long did it take you to search

15  that jeep after his arrest was secured?

16     A.    Well, that was the very first part that I

17  hit was the driver's seat.  Generally, when I

18  search a vehicle, I'll start off in a circular

19  pattern, and I'll start with the driver's seat

20  area.  That was the very first section I searched

21  was there.  And, immediately, upon seeing that bank

22  bag, I just backed out of the vehicle and secured

23  it and waited for a detective to arrive on scene.

24     Q.    Did you -- how many -- do you recall how

25  many cars were behind you or eventually came upon

1    that?

2         A.    Eventually maybe two or three.

3         Q.    Did they -- did there come a time that

4    some units searched the streets?

5         A.    Searched the streets?

6         Q.    Yes.  The streets that where this chase?

7         A.    During that time, I didn't -- I wasn't

8    aware of anything until I -- until we came to our

9    headquarters.  Maybe about an hour later, I was

10   aware that a couple of units did go out and search

11   the street.

12        Q.    And when was that?

13        A.    That was -- I'm assuming it was right

14   after the chase.

15        Q.    And did they find anything?

16        A.    Yes, they did.  But to what they found, I

17   don't know.  I didn't stick around, because, at the

18   time, I was -- I just did my statement for what

19   part I did, and I left headquarters.  I didn't

20   stick around to find out exactly what they found or

21   where they found it at.

22        Q.    And you said you found an Arby's bag in

23   the jeep?

24        A.    Yes, sir.

25        Q.    Was it a leather bag or --

1       A.    Excuse me?

2       Q.    Was it a leather or a paper bag?

3       A.    No.  It was the plastic bag that was in

4  the exhibit.

5       Q.    Plastic bag?

6       A.    Yes, sir.

7       Q.    And when you discovered that plastic bag,

8  were you the -- were you the sole person involved

9  in that searching of the vehicle?

10      A.    Yes, sir.

11      Q.    There was no one else around?

12      A.    No, sir -- there was other people around

13  the vehicle, but nobody else was searching the

14  vehicle with me.

15      Q.    Did you -- did you say to anyone that

16  here, you know, I found this bag here?

17      A.    Oh, I told the supervisor right on scene.

18  And then I told everybody else just to -- just to

19  leave the vehicle alone and wait for the

20  detectives, and I secured it.

21      Q.    You -- you said you didn't find any gun?

22      A.    No, sir, I did not.

23      Q.    While -- and I think you testified that

24  while you were pursuing --

25               (Juror's telephone rings.)

1       Q.   I believe you said while you were

2   pursuing, you did not -- or you could not, if you

3   wanted, to observe anything that was being thrown

4   from the car --

5       A.   Yes, sir.

6       Q.   -- the jeep?  How close -- at any given

7   time, how close were you to the jeep?

8       A.   Due to the speeds, I usually hang back a

9   little bit on the speeds.  The closest I probably

10  was, within him, was probably maybe forty yards.

11  The furthest I got back was maybe sixty yards.

12      Q.   And forty yards would be what, about five

13  times this court -- the length of this courtroom?

14      A.   About three times.

15      Q.   Three times?

16      A.   Three times the length of this courtroom.

17      Q.   And if someone was tossing something out,

18  is it impossible to see it that they were throwing

19  something out?

20      A.   If it was in a well-lit area, possibly

21  yes.  But the road that I was on -- that we were

22  traveling on, it was -- it was dark.

23              MR. DURANT:  Okay.  That's all.

24              MR. POWELL:  Nothing --

25              MR. DURANT:  Let me ask one more

```
1    question.

2         Q.    Is your vehicle equipped with any kind of

3    camera?

4         A.    Yes, sir, it is.

5         Q.    Okay.  Is that -- was your camera working

6    on that evening?

7         A.    Yes, sir, it is.

8         Q.    Did it -- did it make a tape of this

9    chase?

10        A.    Yes, sir, it did.

11        Q.    Did you turn that over to the District

12   Attorney?

13        A.    No, sir.  I don't have the tape with me.

14   It's down at impound.

15        Q.    But the tape would have the entire

16   transaction?

17        A.    Yes, sir, it would.

18                  MR. DURANT:  That' all.  Thank you.

19                  THE COURT:  Anything else?

20                  MR. POWELL:  Nothing further.

21                  THE COURT:  Okay.  You're excused.

22                  (Witness excused.)

23                  THE COURT:  Your next witness?

24                  MR. POWELL:  We'll call Corporal

25   Roberts.
```

1          THE COURT:  If you'll have a seat

2     right over there.

3               COPORAL THOMAS E. ROBERTS

4          The witness, having first been duly sworn or

5     affirmed to speak the truth, the whole truth, and

6     nothing but the truth, testified as follows:

7                    DIRECT EXAMINATION

8     BY MR. POWELL:

9          Q.    Could you state your name for the jury?

10         A.    Corporal Thomas E. Roberts.

11         Q.    And how are you employed,

12    Corporal Roberts?

13         A.    With the Montgomery Police Department,

14    K-9 Division.

15         Q.    And is that what you were doing back in

16    April of this year?

17         A.    Yes, sir.

18         Q.    Now, were you ever called out to the

19    vicinity of the Arby's and Gunter Park off the

20    Bypass on -- in April this year?

21         A.    Yes, sir, I was.

22         Q.    On April 28th, specifically?

23         A.    I believe that was the date, sir.

24         Q.    What was your assignment?

25         A.    They had a -- Arby's on Atlanta Highway

1    had been robbed.  They had a pursuit that took a

2    route down Gunter Park.  They called us up to

3    attempt to locate any type of evidence that wasn't

4    found at the scene.

5        Q.    Was there anything in particular you were

6    looking for?

7        A.    Uh, either looking for a pistol that had

8    possibly been thrown out the vehicle or I believe

9    that they had bank bags that had been taken from

10   the business.

11       Q.    And how -- describe for the jurors how

12   your search --

13       A.    Well, initially, I went west down Gunter

14   Park Drive.  I got about maybe two-or three-hundred

15   yards on Gunter Park Drive.  I looked off to my

16   left-hand side, and I observed, I believe, one bank

17   bag.  One of the bags was laying on the roadway

18   just by the curve.  There was another one that was

19   laying approximately five feet from it.  I stopped

20   my vehicle and got out.  On one of the bank bags,

21   it had been -- it had wrote Arby's on the bank bag.

22   I made a little canvas of the area right there.

23   Within about ten more feet, I located a SouthTrust

24   bank bag that had Arby's written on it also.

25       Q.    Now, I'm going to show you State's 15.

163

1    Do you recognize that?

2         A.    Yes, sir, I do.

3         Q.    What is it?

4         A.    That's going to be clear bags that --

5    with this one over here with Arby's wrote on the

6    bank bag.

7         Q.    Okay.  And you say you saw those --

8         A.    Yes, sir.

9         Q.    -- on the side of the road?

10        A.    Yes, sir.  They were -- this is the

11   roadway here and there's the curve and there's the

12   bags right there in relation to the road.

13        Q.    And is this a fair and accurate depiction

14   of where you saw those bank bags that night?

15        A.    Yes, sir, it is.

16               MR. POWELL:  We offer State's 15.

17               THE COURT:  Admitted.

18               (State's Exhibit No. 15 was admitted

19               into evidence.)

20        Q.    Now, where exactly is State's 15?  What

21   road is this?

22        A.    That's going to be Gunter Park Drive

23   about -- off of Congressman Dickinson, that's going

24   to be about two-hundred yards down on Gunter Park

25   Road right before the curve.

1      Q.    Now, this is a rough -- very rough

2    drawing.   But that's Congressman Dickinson right

3    there.   It has the boulevard and Gunter Park.

4      A.    Yes, sir.

5      Q.    Draw for me -- and it doesn't have to be

6    exact --

7      A.    This is going to be -- what street is

8    this right here?

9      Q.    I'm using my big map.  This would go

10   right here like this, just like that.

11          Now, does that orientate -- orient you a

12   little better?

13     A.    Yes, sir, it does.

14     Q.    Okay.  Now, about where did you find the

15   bank bags?

16     A.    This is the initial stop sign right here.

17   That's east and west Gunter Park right there.

18     Q.    Okay.

19     A.    So it's going to be -- this is the stop

20   sign.   It's going to be, approximately, right in

21   that area.   It was just past the stop signs just

22   past the curve -- the initial curve.

23     Q.    Could you initial that?

24     A.    (Witness complies.)

25              MR. POWELL:  And I'm going to mark

1    this -- I believe, it's going to be State's 23,

2    Your Honor.

3        Q.    And except for the fact that that's not

4    to scale, does that roughly show the intersection

5    of the boulevard, Congressman Dickinson and the

6    Gunter Park area?

7        A.    Yes, sir.

8              MR. POWELL:  We offer State's 23,

9    Judge.

10             THE COURT:  Admitted.

11             (State's Exhibit No. 23 was admitted

12             into evidence.)

13        Q.    Now, I'm just showing -- you didn't

14    actually collect the bank bags?

15        A.    No, sir.  I stayed there with the bank

16    bags until the detectives got there to process

17    them.

18        Q.    Okay.  Did you discover any other

19    evidence at this scene searching the park?

20        A.    Just them clear bags and the SouthTrust

21    bank bag that was located about ten feet from that.

22        Q.    Now, I'm showing you State's 17.  Do you

23    recognize that?

24        A.    Yes, sir.

25        Q.    What is it?

1          A.    That's one of the bags that was found

2     over at -- off of Gunter Park Drive that night.

3          Q.    State's 21, do you recognize that?

4          A.    Yes, sir, that was the one that was

5     found, approximately, ten feet from the other two

6     bags that were located by the roadway.

7          Q.    And State's 18?

8          A.    Yes, sir, that was the other one that was

9     found by the roadway.

10          Q.    And, finally, State's 20?

11          A.    Yes, sir.

12          Q.    These were the type of bank bags you

13     found out there that night?

14          A.    Yes, sir.

15                    MR. POWELL:  Have I offered State's

16     14 and 15?

17                    THE COURT REPORTER:  I don't have

18     it.

19                    MR. POWELL:  Okay.  Your Honor, at

20     this time, we offer State's 14 and 15 --

21                    THE COURT:  Admitted.

22                    MR. POWELL:  -- the photographs of

23     the bags.

24                    (State's Exhibits No. 14 and 15 were

25                     admitted into evidence.)

1           MR. POWELL:  That's all I have,

2      Judge.

3                   CROSS-EXAMINATION

4      BY MR. DURANT:

5           Q.    Corporal Roberts, who directed you to

6      search this area?

7           A.    Who directed me to search the area?  Uh,

8      one of our supervisors --

9           Q.    Okay.

10          A.    -- in the K-9 Division, sir.

11          Q.    Do you know how long after the -- this

12     so-called chase, how long was it before you went

13     out there to --

14          A.    Well, a -- I'm guessing -- just estimate

15     would probably be within a couple of minutes.

16     Initially, when the call went out -- I mean, we all

17     ride over that area in case the suspect flees or --

18     so I was already en route to the area prior to the

19     pursuit taking place.  As soon as the robbery -- we

20     answer all the calls that go out on any robberies

21     in the city, so I was already en route over there.

22     But I'm guessing probably about maybe five

23     minutes --

24          Q.    All right.

25          A.    -- after the pursuit had ended.

168

1         Q.   And did you have -- did you have any

2    difficulty finding any of these bags?

3         A.   No, sir.

4         Q.   Do you -- you were -- were you aware --

5    were you aware that the ground that was canvassed

6    that evening from the time that, you know, they

7    left the Arby's to -- up to Hackle Drive, you knew

8    what --

9         A.   Yes, sir, I knew what was going on over

10   the radio.  I could hear the pursuit going --

11        Q.   And that's about -- could you give a

12   rough estimate as to how many miles that would be?

13        A.   From the business --

14        Q.   Yes.

15        A.   -- of Arby's to Hackle Drive?

16        Q.   Yes.

17        A.   I mean, I --

18        Q.   Well, it's several blocks?

19        A.   Yes, sir, about -- I would say several --

20   several blocks.

21        Q.   Twenty or thirty blocks?

22        A.   Probably.

23        Q.   But when you got up there, you weren't --

24   you weren't able to locate these items immediately?

25        A.   Yes, sir.

1    Q.    What did you use to assist you in?

2    A.    I didn't need anything to assist me

3    initially.  I had seen both them bank bags sitting

4    off the roadway.  It was under a clear lighted area

5    over off Gunter Park.  So I could see them in plain

6    view from the roadway.

7    Q.    Okay.  So there was some light out there?

8    A.    Yes, sir.

9    Q.    There was some light.  You wouldn't say

10    it was dark out there, would you?

11    A.    No, sir.  Of course, that's not a

12    well-traveled road.  I believe the incident

13    happened around 12:40, 12:45 in the morning, so --

14    and that particular drive, there's not much vehicle

15    traffic that goes down there.

16    Q.    If you were behind a -- if you were

17    behind a car and someone were -- and someone was to

18    toss some bags out of a window, what's the

19    likelihood that you would see that kind of motion

20    or that kind or hand action?

21        MR. POWELL:  Your Honor, I'm going

22    to object.  It calls the witness to speculate.

23        THE COURT:  Sustained.

24    Q.    But all of these bags, according to your

25    testimony on direct, were in the -- in close

1    proximity of each other; is that correct?

2        A.   Yes, sir.

3        Q.   Is that -- I think in one of your

4    statements you said that it was -- well, in fact,

5    approximately, ten feet from the bank bag, there

6    were several other smaller plastic bags?

7        A.   Approximately so, yes, sir.

8        Q.   When you got out of your vehicle, did you

9    know what it was right away?

10       A.   Initially?

11       Q.   Yes.

12       A.   No, sir, I didn't.

13       Q.   Okay.  You got out of your vehicle and

14   then examined what you saw?

15       A.   Yes, sir.

16       Q.   Did you also see a mask out there?

17       A.   No, sir, I didn't.  When I located the

18   evidence, I stood beside the evidence until the

19   detectives come out to process for the chain of

20   custody of the evidence.

21       Q.   And you were told by your supervisor to

22   search out there?

23       A.   Yes, sir.

24       Q.   You did not observe anyone throw anything

25   out there?

1          A.    No, sir.

2          Q.    These were -- these were bags out there

3    just as animated as they could be, just sitting

4    there, right?

5          A.    They were sitting off the roadway, yes,

6    sir.

7          Q.    They were sitting off the -- off of --

8    off of Gunter Loop Road; is that correct?

9          A.    Yes, sir -- Gunter Park --

10         Q.    Gunter Park Drive.  I'm sorry.

11         A.    And, it -- I mean, it's normaly common

12   practice when we have any type of pursuit that

13   someone always backtracks that area.  It just

14   wasn't that I picked Gunter Park Drive out of the

15   blue.  That's one of the roads that the pursuit had

16   taken.  Initially, when they stop the vehicle, then

17   we always -- I mean, it's almost common practice --

18   it's just when we're dealing with people that have

19   any type of evidence that they could be wanting to

20   get rid of it, so we --

21         Q.    And intravacking -- and in traversing

22   that area, you didn't find a weapon?

23         A.    No, sir, I did not find a weapon.

24         Q.    You were told to look for a weapon also,

25   is that --

172

```
 1          A.    Evidence, a weapon, some -- something,

 2    yes, sir.

 3          Q.    And if a weapon was thrown out there, you

 4    would have found it, right?

 5          A.    I --

 6          Q.    A lieutenant officer as you are, you

 7    would have found it, right?

 8                    MR. POWELL:  Objection, Judge.

 9    Argumentative.

10                    THE COURT:  Sustained.

11                    MR. DURANT:  That's all.

12                    MR. POWELL:  Nothing further.

13                    THE COURT:  You can step down and

14    you're excused.

15                    (Witness excused.)

16                    THE COURT:  Your next witness?

17                    MR. POWELL:  State calls

18    Corporal Higgins.

19                    THE COURT:  And if you would raise

20    your right hand.

21                 SERGEANT MATTHEW HIGGINS

22        The witness, having first been duly sworn or

23    affirmed to speak the truth, the whole truth, and

24    nothing but the truth, testified as follows:

25                    DIRECT EXAMINATION
```

BY MR. POWELL:

    Q.    Could you state your name for the jury?

    A.    Sergeant Matthew Higgins.

    Q.    Now, Sergeant Higgins, how are you employed?

    A.    City of Montgomery Police Officer.

    Q.    And back in April, how were you employed?

    A.    I was with the K-9 Bureau, Montgomery Police Department as a Corporal.

    Q.    And what's your partner's name?

    A.    Smokey.

    Q.    Now, what -- were you and Smokey called out to a crime scene to the vicinity of Gunter Park involving an Arby's restaurant?

    A.    Yes, sir.

    Q.    Describe for me the circumstances of you going out to Gunter Park.

    A.    I was en route to the area during a pursuit as a backup unit.  Before I arrived, the suspect had been taken into custody.  And we were asked to go out to attempt to locate some evidence.

    Q.    Did you just pick a road?

    A.    No, sir.  It was the path that had been taken by the officers in the pursuit.

    Q.    And you were directed to the specific

1    location?

2         A.    Yes, sir.

3         Q.    How did you go about searching the area?

4         A.    Basically, my partner is trained in

5    evidence recovery.  And both he and I got out, and

6    I put him on lead and we began walking the roadway

7    out at Gunter Park in an attempt to locate

8    evidence.

9         Q.    Were you looking for anything in

10   particular?

11        A.    A weapon, particularly.

12        Q.    Okay.  Did you find a weapon?

13        A.    No, sir, I did not.

14        Q.    You were unable to locate any type of

15   weapon?

16        A.    No, sir.

17        Q.    Okay.  Did the dog hit on anything?

18        A.    Yes, sir.

19        Q.    What?

20        A.    At the corner of Gunter Park and

21   Congressman Dickinson, my partner located a

22   toboggan and some type of dark-colored clothing --

23   cloth.

24        Q.    Okay.  I'm showing you State's 23.  It's

25   a rough map, though it's not to scale of the area

1    of the Boulevard and Congressman Dickinson.  Do you

2    recognize that area?

3         A.   Yes, sir.

4         Q.   Could you basically draw for me where you

5    located the evidence you just described?

6         A.   Okay.  Taking it, this is Congressman

7    Dickinson here --

8         Q.   Correct.  Could you label that for me on

9    State's 23?

10        A.   (Witness complies.)  Yes.  It's going to

11   be in the roadway, so it would be kind of hard, but

12   it would be --

13        Q.   Just draw a circle.

14        A.   It would be -- it would be right in that

15   area there.

16        Q.   Could you initial that for me?

17        A.   Yes, sir.  (Witness complies.)

18             MR. POWELL:  We reoffer State's 23

19   with Sergeant Higgins' modification, Judge.

20             THE COURT:  Admitted.

21             (State's Exhibit No. 23 we

22             readmitted into evidence with

23             modification.)

24        Q.   Now, what did you find at that location?

25        A.   It would be a toboggan, a knit -- like, a

176

1    ski cap and a dark-colored piece -- piece of cloth.

2         Q.    I'm showing you State's 13.  Do you

3    recognize that?

4         A.    Yes, sir.

5         Q.    What's that?

6         A.    That would be the two items that my

7    partner located at the corner of Congressman

8    Dickinson and Gunter Park.

9         Q.    And does that photograph show exactly

10   where they were located?

11        A.    Yes, sir, it does.  It was -- we didn't

12   pick it up or anything.  It was left right there

13   until the detective arrived.

14        Q.    And is that fair and accurate?

15        A.    Yes, sir, it is.

16             MR. POWELL:  We offer State's 13.

17             THE COURT:  Admitted.

18             (State's Exhibit No. 13 was admitted

19             into evidence.)

20        Q.    Now, I'm going to show you what I've

21   marked as State's 16, and ask you to take a look at

22   that for me.  Do you recognize that?

23        A.    Yes, sir.

24        Q.    What is that?

25        A.    That's the piece of -- the piece of cloth

1   that was laying there with the ski -- the toboggan

2   hat.

3       Q.    Now, does that appear to be in the same

4   or substantially the same condition as the night

5   you recovered it --

6       A.    Yes, sir.

7       Q.    -- or you saw it?

8       A.    Yes, sir.

9           MR. POWELL:  We offer State's 16,

10  Judge.

11          THE COURT:  Admitted.

12          (State's Exhibit No. 16 was admitted

13          into evidence.)

14      Q.    Now, did you actually pick this item up?

15      A.    No, sir.  It was left there until

16  Detective arrived to retrieve it.

17      Q.    Okay.  And did you stand there with --

18      A.    Yes.

19      Q.    -- what's shown in State's 13 --

20      A.    Yes.

21      Q.    -- the ski mask -- or the mask with the

22  holes cut in it --

23      A.    Yes.

24      Q.    -- until the Detective arrived to collect

25  it?

178

1    A.    Yes, sir, I did.

2    Q.    And did anybody come and do anything to

3    any of the evidence --

4    A.    No, sir.

5    Q.    -- while you were there?

6    A.    No.

7    Q.    It was just you and your dog?

8    A.    Yes, sir.

9    Q.    Did you find any other evidence out there

10   on the scene?

11   A.    No, sir, just that.

12            MR. POWELL:  I think that's

13   everything I have for Sergeant Higgins.

14            CROSS-EXAMINATION

15   BY MR. DURANT:

16   Q.    Officer Higgins --

17   A.    Sir?

18   Q.    -- you were looking for a weapon in

19   particular; is that correct?

20   A.    Yes, sir.

21   Q.    And you went -- you went over the entire

22   course; is that correct?

23   A.    We walked Gunter Park and Congressman

24   Dickinson where we located those items, and that's

25   where we stopped.

1      Q.   You stopped there?

2      A.   Yes, sir.

3      Q.   Why did you stop there?

4      A.   Once we located that evidence, it's my

5 responsibility to secure it until somebody comes

6 there to retrieve it.

7      Q.   Okay.  But you terminated your search for

8 a weapon?

9      A.   Sir?

10      Q.   You terminated the search for a weapon at

11 that time?

12      A.   I did, my part, yes, sir.

13      Q.   And you were convinced that there were no

14 weapons around that area?

15      A.   The area that I had walked with my

16 partner, yes, sir.

17      Q.   You didn't see any -- you didn't --

18 you -- obviously, you didn't see anyone throw these

19 items out of a -- out of a moving vehicle or

20 anything like that, did you?

21      A.   No, sir.  I was called after the fact.

22      Q.   Okay.  And you don't know how long these

23 items were out on the roadway, do you?

24      A.   No, sir.

25      Q.   And you -- what did you -- what did you

1    recover that evening -- or that morning -- early

2    morning?  A toboggan, you said?

3         A.    Yes, sir.

4         Q.    What did that look like?

5         A.    It's like a knit hat.

6         Q.    Okay.  A knit hat?

7         A.    Yes, sir.

8         Q.    And you also recovered a dark-colored

9    piece of cloth with the --

10        A.    -- holes cut in it.

11        Q.    Did the Detective take -- secure the

12   toboggan -- did he take those with him?

13        A.    Yes, sir.

14        Q.    And the dark-colored piece of cloth?

15        A.    Yes, sir.

16        Q.    Those were the two pieces that you found?

17        A.    Yes, sir.

18                  MR. DURANT:  That's all.

19                  MR. POWELL:  Nothing further, Judge.

20                  THE COURT:  You can step down and

21   you're excused.

22                  (Witness excused.)

23                  MR. POWELL:  Your Honor, Detective

24   Butterbaugh is going to be my last witness, but he

25   may take ten -- fifteen to twenty minutes.  Do we

1    want to take a break?

2                THE COURT:  We can start -- does

3    anybody need to take a break?

4                (No response.)

5                THE COURT:  You can start.

6                MR. POWELL:  Okay.

7            DETECTIVE C. J. BUTTERBAUGH

8      The witness, having first been duly sworn or

9    affirmed to speak the truth, the whole truth, and

10    nothing but the truth, testified as follows:

11              DIRECT EXAMINATION

12    BY MR. POWELL:

13        Q.    Could you state your name for the jury?

14        A.    Detective C. J. Butterbaugh.

15        Q.    And how are you employed, Detective

16    Butterbaugh?

17        A.    I'm a homocide investigator with the City

18    of Montgomery.

19        Q.    Okay.  Now, what is the distinction

20    between your designation as Detective versus the

21    K-9 officers we just heard from or the patrol

22    officers we just heard from?

23        A.    Different divisions within a police

24    officer that he would have different aspects of the

25    police work.

1        Q.    Describe the -- the division of labor,

2    so-to-speak, for the jury.

3        A.    K-9 officers do more searches and -- such

4    as with the animal drug searches, drug

5    identification, building searches, searching for

6    evidence while detectives actually do

7    investigations into the crimes committed.

8        Q.    Versus -- what are the primary function

9    as a patrol unit?

10       A.    Patrol officers are initial responders.

11   They handle the initial on the scene, such as we

12   have today.  They handle initial duties at a scene,

13   help apprehend suspects as in this case.

14       Q.    So once a patrol had secured the scene,

15   so-to-speak, the K-9's did their search, then you

16   come in and follow-up with the investigation?

17       A.    Yes.

18       Q.    Now, where was the first place you went

19   regarding this -- first of all, this is a robbery

20   of the Arby's?

21       A.    Yes, sir.

22       Q.    On Atlanta Highway?

23       A.    Yes.

24       Q.    Back in April?

25       A.    Yes, sir.

1       Q.    28th?

2       A.    Yes, sir.

3       Q.    Did all that occur here in Montgomery

4   County?

5       A.    Yes, it did.

6       Q.    Now, where was the first place you went

7   in response to this investigation?

8       A.    Well, after leaving headquarters, I

9   initially drove to the Arby's.  I saw another

10  Detective was there, so I went straight out to

11  the -- where a vehicle pursuit had ended and the

12  suspect was taken into custody.

13      Q.    At that point, did you search the

14  vehicle?

15      A.    Yes, I did.

16      Q.    I'm showing you State's 10 and 11.  Do

17  you recognize those?

18      A.    Yes, I do.

19      Q.    What are they?

20      A.    They're the vehicle driven by the

21  defendant.

22      Q.    Did you find any evidence as a result of

23  your search of that vehicle?

24      A.    Yes, I did.

25      Q.    What was that?

184

1    A.    A SouthTrust bank bag, a plastic

2  temporary, from the appearance, bank bag with money

3  in between the driver's seat and the middle

4  console.  And, also, white gloves, like, cloth

5  gloves with rubber grips on the palm.

6    Q.    And I want to talk about the bank bag

7  first, State's 12.  Do you recognize that?

8    A.    Yes, I do.

9    Q.    What is that?

10    A.    That's a rear shot of the front seat of

11  the vehicle where the bank bag is in the -- between

12  the driver's seat and the middle console.

13    Q.    Okay.  Now -- and regarding all of these

14  photographs, with the exception of State's 1, the

15  photograph of the defendant, all of these other

16  photographs we're dealing with, did you actually

17  take those pictures?

18    A.    Yes, I did.

19    Q.    Now -- and you took State's 12?

20    A.    Yes, I did.

21    Q.    And I'm showing you now State's 19.  Do

22  you recognize that?

23    A.    Yes, sir.

24    Q.    Where was State's 19 found?

25    A.    This one was found in -- this is the one

185

1    that was found in the vehicle in between the

2    driver's side and the middle console.

3        Q.    Now, as part of State's 19, there's a

4    brown paper bag there with some writing on it.  Is

5    that your handwriting?

6        A.    Yes, it is.

7        Q.    Did you actually put that item in that

8    brown paper bag?

9        A.    Yes, I did.

10       Q.    And did you mark it?

11       A.    Yes, I did.

12       Q.    And what did you write on there?

13       A.    Empty plastic SouthTrust bank bag from

14   truck.  Money returned to manager.

15       Q.    And that's how you keep up with where you

16   collected these items of evidence?

17       A.    Yes.

18       Q.    Okay.  Now, thank you, Detective.  You

19   say you found some gloves from the truck?

20       A.    Yes, I did.

21       Q.    Where?

22       A.    In the back compartment behind the second

23   seat in the storage area of the sport utility

24   vehicle.

25       Q.    And I'm going to show you State's 22 as a

1  brown paper bag.  First off, there's some writing

2  on it.  Did you write that on there?

3       A.   Yes, I did.

4       Q.   And what's in the brown paper bag?

5       A.   They're cloth gloves with the rubber --

6  rubber grips on the palm.

7       Q.   And they appear to be in the same or

8  substantially the same condition as they were the

9  night you collected them?

10      A.   Yes, they -- they appear --

11           MR. POWELL:  We offer State's 22,

12  Judge.

13           THE COURT:  Admitted.

14           (State's Exhibit No. 22 was admitted

15           into evidence.)

16      Q.   Now, after you had searched the truck,

17  did -- were you called over to secure any other

18  items of evidence?

19      A.   Yes, I was.

20      Q.   What?

21      A.   Some additional bank bags from -- from

22  Arby's.

23      Q.   Okay.  First off, I'm going to show you

24  State's 14 and 15, and ask if you recognize those?

25      A.   Yes, I do.

1    Q.    What are they?

2    A.    They're two of the same -- correction --

3  three of the same plastic bags as in the previous

4  one.  And then it looks like a leather -- I believe

5  it to be leather or --

6    Q.    Detective, kind of hold up those two

7  exhibits in the same way you found them.

8    A.    (Witness complies.)  They were --

9  approximately, like this.

10    Q.    Close together?

11    A.    Yes, they weren't too far apart.  They

12  were further apart than -- to -- for me to take a

13  picture of both of them so that we could still see

14  what they were.  That's why I took them separately.

15    Q.    Now, I'm going to show you State's 17,

16  18, and 20.  Do you recognize those?

17    A.    Yes, I do.

18    Q.    What are they?

19    A.    These are three SouthTrust bank bags with

20  Arby's written on them.

21    Q.    Are those the same bank bags that were

22  shown in State's 15, a picture on them on the side

23  of the road?

24    A.    Yes.

25    Q.    And did you collect those?

1     A.    Yes.

2     Q.    And they appear to be in the same or

3  substantially the same condition as when you

4  collected them that night?

5     A.    With the exception -- there were money --

6  there was money in it when I -- when we collected

7  them.  That money was counted and turned over to

8  the manager.

9     Q.    With the exception of the money?

10     A.    With the exception of the money, they're

11  the same.

12     Q.    You had to open them to get to the money?

13     A.    Yes, sir.

14               MR. POWELL:  We offer those, Judge.

15               THE COURT:  Admitted.

16               (State's Exhibits No. 17, 18, and 20

17               were admitted into evidence.)

18     Q.    State's 21, what is that?

19     A.    That is the -- the other bank bag that

20  was located close to those three on Gunter Park

21  Drive.

22     Q.    What's shown in State's 14?

23     A.    That's the same bag.

24     Q.    Okay.  And it had money in it too?

25     A.    Yeah, it had money as well.

1      Q.   Other than the money, is that in the same

2  or substantially the same condition?

3      A.   Yes, it is.

4           MR. POWELL:  We offer that, Judge.

5           THE COURT:  Admitted.

6           (State's Exhibit No. 21 was admitted

7           into evidence.)

8      Q.   Now, were there any other items of

9  evidence that you went and collected from the

10  vicinity of Gunter Road and Congressman Dickinson

11  Boulevard?

12      A.   Yes, there was.

13      Q.   What were those?

14      A.   They were a -- there was a mask or it was

15  a hood that was fashioned into a mask with a -- it

16  had the eyes and the mouth cut out, and -- yes,

17  that's it.

18      Q.   I'm showing you State's 13.

19      A.   Yes.

20      Q.   Do you recognize that picture?

21      A.   Yes, I do.

22      Q.   Did you take it?

23      A.   Yes, I took this picture.

24      Q.   Picture of the mask?

25      A.   Yes.

1    Q.    And State's 16, what is that?

2    A.    That is the -- the hooded mask or the

3    mask that was recovered from Gunter Park Drive

4    right at the intersection of Congressman Dickinson.

5    Q.    And you actually picked this up?

6    A.    Yes, I did, I collected that.

7    Q.    And when you collected the bank bags and

8    the mask, were a Corporal Roberts and

9    Sergeant Higgins, respectfully, standing out there

10    by those items?

11    A.    Yes, they were.

12    Q.    And, to your knowledge, had anybody

13    tampered with anything or messed with anything or

14    put anything there that they didn't secure?

15    A.    No.

16    Q.    And going back to the evidence found in

17    the white truck, did anybody that you know of

18    tamper with that crime scene or place anything in

19    that truck?

20    A.    No.

21    Q.    Let's do this real quick.  State's 1, do

22    you recognize that?

23    A.    Yes, I do.

24    Q.    What is it?

25    A.    It is a booking photo of Mr. Smith that

1    was taken out at police headquarters in the

2    Detective Division.

3         Q.    The night all this occurred?

4         A.    The night that he was apprehended, yes,

5    sir.

6         Q.    So that's the way he looked immediately

7    after this chase?

8         A.    Yes, that is how he looked.

9         Q.    And that's what he was wearing?

10        A.    Yes, it was.

11               MR. POWELL:   Judge, I'm not going to

12   offer this, but I'll -- never mind.

13        Q.    That shirt he's got on there, y'all

14   collected that shirt?

15        A.    Yes, we did.

16        Q.    And y'all have it in evidence?

17        A.    Yes.

18        Q.    Now, I want to take you back now,

19   Detective, actually into the Arby's restaurant

20   itself.  I've got a series of photographs here.

21   Let's start with State's 8 and 9.  What are those

22   photographs of?

23        A.    9 is the rear door of Arby's that --

24   where the suspect made his escape.  If you can see

25   on the ground here, there's a bar and that's a bar

1    that's used to help secure the door.

2         Q.   And State's 8?

3         A.   8 is the safe behind the counter at

4    Arby's opened.

5         Q.   Now, with the Court's permission, could

6    you step down?  I want to spread these other

7    photographs out for the jury -- first of all, let

8    me get you to identify them and admit them into

9    evidence.  Detective, flip through those four -- 2,

10   3, 5, 6, and 7.  Do you recognize all of those?

11        A.   Yes, I do.

12        Q.   What are they collectively photographs

13   of?

14        A.   The restroom area of Arby's, the Arby's

15   where the offense occurred.

16        Q.   And did you take these?

17        A.   Yes, I did.

18        Q.   And are they fair and accurate of that

19   area?

20        A.   Yes, they are.

21             MR. POWELL:  We offer all these,

22   Judge.

23             THE COURT:  Admitted.

24             (State's Exhibits No. 2, 3, 5, 6,

25             and 7 were admitted into evidence.)

1      Q.   Now, I'm going to spread these out on the

2    jury rail.  Now, Detective, what did you discover

3    when y'all looked into the bathroom at the Arby's?

4    What's significant about these photographs?

5      A.   Well, upon looking into the bathroom, we

6    noticed -- you can see here, this is sheetrock type

7    insulation --

8      Q.   You're referring now to State's 5?

9      A.   5 and --

10     Q.   -- and 7.

11     A.   7.  Also on top of the urinal as well,

12   which is 6.  There's a -- few little pieces of

13   sheetrock that came from the ceiling.

14     Q.   Okay.  Now, what about State's 4, this

15   railing here, is there anything that appears to be

16   significant to you on that railing?

17     A.   Yes, the railing is in the, where the

18   commode is, inside the stall.  And there was a

19   sheetrock, what appeared to be a print of a boot or

20   shoe on the rail in what appeared to be sheetrock

21   or the --

22              THE COURT REPORTER:  I'm sorry.

23   Sheetrock or what?

24              THE WITNESS:  -- or the light.

25     Q.   I want to refer you now, specifically, to

1    State's 2 and 3.  What are these photographs of?

2         A.    2 is the ceiling tile.  If you can

3    tell -- this tile here behind the light has been

4    raised.  This was in the condition it was when I

5    first went in there and located it and saw it.

6         Q.    We're not talking about a hole busted in

7    the ceiling?

8         A.    No, no, not at all.

9         Q.    Describe for the -- we've all seen this

10   kind of ceiling before.  But describe to the jury

11   what kind of ceiling we're talking about.

12        A.    It's a hanging ceiling tile that it sits

13   on a rail probably -- depending on where it is --

14   certain height from the ceiling -- from the actual

15   ceiling and --

16        Q.    How do you get up in the ceiling?

17        A.    You would push the tiles up and move them

18   over to get up into the ceiling.

19        Q.    And that's what you observed here?

20        A.    Yes.  This is raised slightly.  It wasn't

21   centered properly on the railing, the track that

22   the tile sits on.

23        Q.    And State's 3, what's that a paragraph

24   of?

25        A.    This is actually inside the ceiling under

1    the -- or above the tile.

2         Q.   You removed the tile?

3         A.   I pushed the tile out of the way to show

4    the space between where the tile was --

5         Q.   Why were you doing that?

6         A.   -- to show that there was enough room for

7    a person to get up in.

8         Q.   Okay.  Let me -- normally, does a person

9    sit on this type of drop ceiling?

10        A.   No.  And as you can see, there was wooden

11   braces up there.

12        Q.   Now, after you examined the bathroom as

13   described in these series of photographs, as I

14   believe 2 through 7 -- have a seat, Detective?

15        A.   (Witness complies.)

16        Q.   Did you draw any conclusions from the way

17   you found the bathroom?

18        A.   Yes.  It was -- it gave the appearance of

19   someone --

20                  MR. DURANT:  Objection.

21                  THE COURT:  Just what your

22   observations.

23        Q.   Yes.  What were your observations about

24   the appearance of the bathroom?

25        A.   With the -- with the way the tile wasn't

1    seated properly and with the material on the floor

2    and urinal.  And on the railing, it looked like

3    somebody had been in the ceiling and climbed up and

4    climbed back down.

5        Q.    Now, did you locate any other items of

6    evidence inside the actual Arby's restaurant

7    itself?

8        A.    There was actually a videotape, but it

9    was nonfunctional.  It was collected, but it was --

10    the video was nonfunctional.

11        Q.    It didn't show anything?

12        A.    No.

13        Q.    It wasn't even working?

14        A.    It wasn't working.

15        Q.    Anything else?

16        A.    No, sir.

17        Q.    Did you attempt to take any fingerprints

18    or anything?

19        A.    No, sir.  The suspect was caught with the

20    property and also he was wearing gloves at the time

21    of the offense.

22        Q.    Okay.  So, aside from what you did at the

23    Arby's, securing the truck with the bank bag and

24    collecting the other items of evidence, are there

25    any other steps in this investigation?

1      A.    No.   Returning to headquarters and --

2    because of the evidence, place him into custody or

3    sign warrants.

4                    MR. POWELL:  I don't think I have

5    anything further, Judge.

6                    THE COURT:  Mr. Durant?

7                    CROSS-EXAMINATION

8    BY MR. DURANT:

9      Q.    Officer Butterbaugh, you said you seized

10   a bank bag and white gloves from the truck; is that

11   correct?

12     A.    Yes, sir.

13     Q.    How many -- how many pairs of white

14   gloves did you see in the truck?

15     A.    It was approximately -- it was three

16   pairs.

17     Q.    It was three pairs?

18     A.    Yes, sir.

19     Q.    And they were all -- were they all alike?

20     A.    With the exception of the amount of dirt

21   and how -- the cleanliness of them, yes, they

22   appeared to be so.

23     Q.    Did they appear -- did they appear to you

24   to be work gloves that somebody used in the regular

25   course of doing jobs and so forth?

1      A.    Yes, as described by the witnesses.

2      Q.    But it's not unusual for somebody to be

3   carrying around gloves in your car?

4      A.    I can't advise.

5      Q.    Pardon me?

6      A.    I can't advise how many people carry

7   gloves in the car, sir.

8      Q.    It's not unusual, is it?

9      A.    I can't advise.  I wouldn't think so.

10      Q.    Okay.  Thank you.  And you said you went

11   to the Arby's at first; isn't that correct?

12      A.    Yes.

13      Q.    And then you went to the -- where the

14   chase had occurred?

15      A.    To where it ended at, yes, sir.

16      Q.    Where it ended.  And you were the one who

17   collected, as you test -- collected the bags and so

18   forth that were -- that the -- the bags that were

19   found on the side of the road?

20      A.    Yes, sir.

21      Q.    Are police cars equipped with -- with

22   video cameras?

23      A.    I believe some are and some aren't.

24      Q.    And do you know whether this -- in this

25   particular incident whether the video was

1    operative?

2         A.    I was advised that there was video.  I --

3         Q.    You were advised that there was video?

4         A.    I haven't seen video of it, no, sir.

5         Q.    You didn't see -- you didn't review it?

6         A.    No, sir.

7         Q.    As the case agent, you don't think that

8    that's something that would have been pertinent?

9         A.    Mr. Smith was apprehended with the

10   evidence in his --

11        Q.    Pardon?

12        A.    -- possession, sir.

13        Q.    I didn't --

14        A.    Mr. Smith was apprehended with the

15   evidence in his possession.

16        Q.    Yeah, but there was some question -- you

17   don't know -- do you know whether those bags were

18   thrown from the vehicle?

19        A.    I wasn't in the pursuit, sir.

20        Q.    Okay.  But is it possible that the video

21   camera could have recorded those?

22        A.    If the video was working and it was on

23   the vehicle light, I would imagine that it would

24   be.  Like I said, I wasn't in the pursuit.  I don't

25   know what angles --

1    Q.   But -- but you -- but you were aware that

2    it was operative?

3    A.   I was advised there was a video, yes,

4    sir.

5    Q.   And you didn't review -- you didn't take

6    the diligence to review it, to see whether you

7    could pick up anything from that video?

8    A.   There was no need to.  The evidence was

9    in Mr. Smith's possession where --

10   Q.   That that's what you say --

11   A.   Yes, sir.

12   Q.   -- it was in his possession?

13   A.   Yes, sir.

14   Q.   But couldn't that have sort of

15   supplemented whatever doubts that there might be

16   about where what -- where what was found and all of

17   that, if you had a video?

18   A.   Sir, I saw where the evidence was with my

19   own eyes in the vehicle.

20   Q.   And you said you took photo -- pictures

21   of the bathroom?

22   A.   Yes, sir.

23   Q.   And you said there was some kind of

24   residue from the fact that the ceiling was tampered

25   with?  Isn't that what you testified was on the

1  floor?

2       A.    Yeah, some sort of sheetrock like

3  material or the such.

4       Q.    And you would -- would you say that

5  someone who was sweeping up the bathroom floor

6  would sweep that up before you had a chance to --

7  to see the debris on the floor?  Do you understand

8  my question?

9       A.    Um --

10      Q.    If someone cleaned the bathroom, what you

11 found would not have been there?  Is that -- isn't

12 that a fair statement?

13      A.    Between when -- between when the robbery

14 happened and --

15      Q.    The time --

16      A.    -- when I went up there?

17      Q.    The time that you took your photographs?

18      A.    If someone cleaned it between when the

19 robbery occurred and when I went there, I would

20 imagine it wouldn't be there.  I would imagine that

21 whoever cleaned would clean it up.

22      Q.    Okay.  You said that there was a foot --

23 you said there was a footprint --

24      A.    It appeared to be.

25      Q.    -- in the sheetrock?

1    A.    Yes, sir, it appeared to be, sir.

2    Q.    Okay.  Did you -- did you try to get a --

3 a replica of that footprint and compare it to the

4 shoes that Mr. Smith was wearing?

5    A.    Did I try to lift the shoe print off the

6 railing?

7    Q.    Yes.

8    A.    No, sir, I didn't try to lift the shoe

9 print off --

10    Q.    Did you try to lift it off the sheetrock?

11    A.    No, sir.

12    Q.    Why?

13    A.    There was no need to at the time, sir.

14 This was after we had determined that Mr. Smith had

15 the evidence in his possession.

16    Q.    Okay.  But don't you -- you know, in your

17 police investigation, don't you try to get all of

18 the evidence and more?  Isn't that going to make

19 your case a little more airtight?

20    A.    In this case, there was -- I didn't see a

21 way around it.  It was tight -- the evidence was

22 tight.  The bag said Arby's written in big letters

23 on the bag -- on the bag, the one that was found in

24 his possession in the vehicle that he was taken out

25 of by police.

1      Q.   If the car was speeding -- and it's been

2  reported that the car was speeding up to eighty,

3  eighty-five miles an hour at different times and

4  bags were thrown.  How -- how would those bags

5  necessarily land on the side of the road?  Would

6  they -- would they have some velocity through it?

7      A.   I'm not an expert on direct trajectory --

8  excuse me.  I can't advise how they would land.

9      Q.   But if they were thrown, they would have

10 a little bit of weight.  Would you concur with me

11 that that -- that the chances of -- that the

12 chances were great that pursuing officers would

13 discern that, when something was thrown from the

14 window?

15     A.   Sir --

16          MR. POWELL:  Your Honor, we object

17 to that question, ask him to speculate what --

18          THE COURT:  Sustained.

19          MR. POWELL:  -- other witnesses may

20 or may not have seen.

21     Q.   Did you take a statement from -- did you

22 take -- were you involved in taking a statement

23 from the witnesses of the Arby's?

24     A.   No, sir, that was my partner.

25     Q.   And who is that?

1       A.   Detective Harrison.

2       Q.   Harrison?

3       A.   Yes, sir.

4       Q.   Do you have your file with you?

5       A.   Yes, sir, I do.

6       Q.   Could you find the statement given by

7   Ms. Atkins at the office?

8       A.   The statement -- Mr. Powell has the

9   statements.

10       Q.   Did you do an audio?

11       A.   I didn't.  No, I didn't, sir.  That would

12   have been my partner.

13       Q.   Did -- did your partner take audio

14   statements from all of the witnesses?

15       A.   I believe so, yes, sir.

16       Q.   And what are the headings of those

17   statements?

18       A.   The headings?

19       Q.   Yes.

20       A.   Starts with voluntary statement form,

21   Montgomery Police Department, Division Detective

22   Bureau, Property, Date, 4/28/02.

23            MR. DURANT:  Can I take a look at

24   those?  May I approach?

25            THE COURT:  Yeah.  Come up here.

1           MR. POWELL:  Your Honor, they're the

2    same statements we disclosed to Mr. Durant in --

3           MR. DURANT:  I just wanted to --

4           THE COURT:  You can look at them.  I

5    don't know where you're going with this witness on

6    them.

7           THE WITNESS:  May I?

8           MR. POWELL:  Yeah.  He's got it

9    already.

10          CROSS-EXAMINATION (continued)

11   BY MR. DURANT:

12       Q.   And you're aware that none of -- none of

13   the people in Arby's were able to identify

14   Mr. Smith; isn't that correct?

15       A.   By face.  He was wearing a mask, sir.

16       Q.   Okay.  And did you say that you

17   personally found the bag in the -- in the jeep?

18       A.   I recovered the bag.

19       Q.   When you say you recovered it, what do

20   you mean?

21       A.   Like, I collected it.  I'm sorry.  I

22   collected it and -- for chain of custody, I kept --

23       Q.   Who --

24       A.   The first officer -- Officer Koerner

25   advised that he thought there was a bag in there.

1    He saw a bag.  At which point, I went in there,

2    collected the bag, saw that -- the Arby's written

3    in big letters on it.  At which time, I collected

4    it and kept it in my possession until it was --

5    opened, the money counted, given to Mr. Bly who was

6    the manager and impounded the bag.

7        Q.    Okay.

8        A.    In our impound lot downstairs in the

9    bottom of the police station.

10                  MR. DURANT:  Okay.  That's all.

11                  THE COURT:  Anything else?

12                  MR. POWELL:  Nothing further, Judge.

13                  THE COURT:  Okay.  Come up here and

14   let me see where we are.

15                  THE COURT REPORTER:  Is everything

16   admitted, Meridith?

17                  THE COURT REPORTER:  I'm not sure

18   about 9.

19                  MR. POWELL:  Just for the Record,

20   Judge, we -- I think we've got State's 1 through

21   23.  Everything has been identified, marked and

22   authenticated.  We move to offer anything 1 through

23   23 that we haven't already.

24                  THE COURT:  Admitted.

25                  (Anything not already admitted

1          State's 1 through 23 admitted.)

2                    THE COURT:  How many more witnesses?

3                    MR. POWELL:  At this time, the State

4     rest.

5                    THE COURT:  Okay.  We're going to

6     take about a ten-minute break.  And I'm hoping we

7     can get through with most of the testimony today.

8     If we had to go just a few minutes after five,

9     would it cause anybody a problem?

10                   (Jurors nod.)

11                   THE COURT:  Okay.  Hopefully, we

12    won't.  But we'll get you in about ten minutes in

13    the jury assembly room.

14                   (Out of the presence of the jury.)

15                   THE COURT:  At this time, the State

16    has rested.  And, Mr. Durant, did you have any

17    motions?

18                   MR. DURANT:  The defense, at this

19    time, Judge, moves for a directed verdict based on

20    the fact that the State has not provided enough

21    evidence to tie my client in with this robbery.

22    And I don't believe that a prima facia case has

23    been proven in this incident.

24                   THE COURT:  Well, I've heard the

25    evidence, and I think a jury question is presented.

1    I'm going to deny your motion.

2                    (Brief recess was taken.)

3                    (In the presence of jury.)

4                    THE COURT:  Well, at this time, the

5    State's rested -- and I might add, you don't have

6    to go to the same chair unless you particularly

7    want to.  But the State has rested at this time.

8    Mr. Durant --

9                    MR. DURANT:  I'll call Mr. Charles

10   Smith to the stand.

11                   THE COURT:  Mr. Smith, if you'll

12   come take the stand?

13                   (Witness complies.)

14                   THE COURT:  And if you'll raise your

15   right hand.

16                        CHARLES SMITH

17        The witness, having first been duly sworn or

18   affirmed to speak the truth, the whole truth, and

19   nothing but the truth, testified as follows:

20                   DIRECT EXAMINATION

21   BY MR. DURANT:

22        Q.    Would you state your name for the ladies

23   and gentlemen of the jury, please?

24        A.    Charles Smith.

25        Q.    Mr. Smith, on April the 28th, where were

1    you in the early evening of that day -- in the

2    early evening of that particular date?

3        A.    Well, in that -- that afternoon -- well,

4    evening, I was in Shorter, Alabama.

5        Q.    Okay.  What were you doing in Shorter?

6        A.    I go to the track down there a lot -- dog

7    track.

8        Q.    Do you recall when you left --

9        A.    Yes, I do.

10       Q.    -- the dog track?

11       A.    Yes.

12       Q.    Would you tell the ladies and gentlemen

13   of the jury the approximate time?

14       A.    I always leave right at 11:00, 11:15.

15       Q.    And when you left Shorter, which route

16   did you take?

17       A.    I -- I come down Interstate -- I was on

18   85 headed -- coming west coming home.

19       Q.    Coming back to Montgomery?

20       A.    Coming back to Montgomery.

21       Q.    And where did you turn off?

22       A.    Oh, I turned off -- I got off Exit -- the

23   Mitylene Exit onto Atlanta Highway.

24       Q.    Uh-huh.  And where did you -- after you

25   got off on Mitylene and onto the Atlanta Highway

1    you said --

2         A.    Uh-huh.

3         Q.    -- where did you go?

4         A.    I got -- I was still on Atlanta Highway,

5    and I was going -- I had needed me a can of skoal,

6    and I was going to stop at that BP right there on

7    Burbank, but I just made a u-turn up in the service

8    station.  And I was going to that Entech up there

9    on that Northern Bypass.

10        Q.    Did you -- did you go to the Entech?

11        A.    No, I didn't have a chance to go to the

12   Entech.

13        Q.    Okay.  Let me ask you directly.  Did you

14   ever go into that Arby's that evening?

15        A.    No, I didn't.

16        Q.    Did you have a gun on you that evening?

17        A.    No, I didn't.

18        Q.    Did you hold -- did you -- did you show a

19   weapon to anyone in the Arby's that evening?

20        A.    No, I didn't.

21        Q.    Were you in the vicinity of the Arby's?

22        A.    I was on -- right at -- on the corner at

23   that BP service station.  You've got the BP service

24   station and you've got the McDonald's next to it,

25   and then you've got the Arby's.  I came back out

1    and made a right turn heading west --

2         Q.    A west on what, Atlanta?

3         A.    On -- headed west on Atlanta.

4         Q.    Okay.  Did there come a time that you --

5    that you realized that you were being followed?

6         A.    Yes, I did.

7         Q.    When did you first have an inkling or

8    when did you first discern that you were being --

9    when did you first realize you were being followed?

10        A.    After I had come up out of the inter --

11   after I come up out of the service station and was

12   going down Atlanta, I got up about, um, right

13   there -- where is -- where the Red Lobster sitting

14   on the corner of Atlanta Highway and that service

15   road.

16        Q.    Okay.

17        A.    I was --

18        Q.    Just off -- by the mall?

19        A.    Yes, by the mall.

20        Q.    Okay.  And you -- you went down the

21   service road?

22        A.    Yes, I turned down the service road

23   because I was going to the Northern Bypass over

24   there to the Entech.

25        Q.    Uh-huh.

1    A.    That's where I was going to get me a can

2    of skoal, because it was cheaper over there.  And

3    I -- as I was going down the service road, I

4    observed a vehicle behind me.

5    Q.    Okay.  When you observed this vehicle

6    behind you, did you do anything?  Did you decide

7    to -- you know, what did you do?  Did you continue

8    on the same course?

9    A.    I continued on the road.  I went on up on

10   the Northern Bypass.  I got to the -- you know,

11   you've got a light there, and I made a right turn

12   at the light.  That's -- it's Twain Curve.  From

13   Twain Curve to Oliver Road, I turned -- was going

14   down, and I slowed up.  And the vehicle --

15   Q.    Was the black vehicle still behind you?

16   A.    I don't know what color it was.  I -- but

17   I observed a vehicle still tailing me.  I turned on

18   Oliver Road, went all the way up -- went all --

19   came all the way back around Oliver Road and come

20   to Plantation, turned to -- took a left on

21   Plantation, come back up to the Northern Bypass.  I

22   slowed up a little.

23   Q.    What were you -- were you -- were you --

24   what were you doing?  Were you trying to see just

25   whether this person would continue following you?

1      A.   Yes, I -- I'm trying to really figure out

2  what that person is doing following me.  What is

3  it?  Who is it?  You know, because it scared me for

4  a minute.  So I just slowed up, and I went on up to

5  the Northern Bypass.  And I still kept looking in

6  my mirror back.  I went across at the stop sign.  I

7  went across over on the other side of the Northern

8  Bypass, and I took a left.  I went back down to --

9      Q.   Okay.  Let me ask you this, Mr. Smith.

10  Did there come a time that police officers got

11  behind you?

12      A.   Yes.

13      Q.   And what junction was that?  What

14  intersection -- what street did these officers get

15  behind you?

16      A.   You have -- after I turned right there

17  on -- back up on the Northern Bypass, I went down

18  to the intersection again to -- I had passed

19  Entech, because it was closed.  I went down to

20  Plantation.  I took a right at the light, and I

21  went about twenty-five yards -- and I'm still

22  observing, you know, the vehicle behind me.  And

23  that's when -- oh, about two or three seconds after

24  I seen -- I looked in my rearview mirror and seen

25  the lights.  And I just panicked, because I -- I

1    know I ain't -- I don't have my insurance

2        Q.   Okay.  Let me ask you this.  They put on

3    the emergency equipment.  And why didn't you stop?

4        A.   No, I didn't stop.  I just panicked,

5    just -- because I know I didn't have my insurance.

6    I had just got a ticket, you know, driving without

7    insurance.  I had just got a ticket about a week

8    later.  So I just, you know, didn't know what to

9    do.  I just kept on going.

10        Q.   So why -- why did you keep -- why did you

11    keep on going for the next three or four miles?

12        A.   I don't know.  I just had to pull myself

13    together.  But I wasn't speeding or nothing.  I

14    just went down to the --

15        Q.   Now, you've heard testimony that you were

16    traveling upwards of eighty miles an hour -- you

17    were traveling upwards of eighty miles an hour?

18        A.   I don't think nobody in this -- in this

19    world can travel eighty miles an hour on the back

20    of Lagoon Park without flipping their car over.

21        Q.   Okay.  Did you -- did there come a time

22    that you felt comfortable or secure enough to stop?

23        A.   Yes, I was -- I was going to -- I was

24    going to stop.

25        Q.   Well, why didn't you stop before?

1    A.    I was trying to get into some light --

2    wasn't no -- ain't no light down there.

3    Q.    Why were you trying to get into some

4    light?

5    A.    So I can -- when I stop, you know, police

6    and somebody can come by and see -- see me out

7    there talking to the police or the police -- so

8    they wouldn't jump on me or nothing.

9    Q.    Okay.  So you finally stopped, right?

10    A.    I finally stopped.

11    Q.    And you heard the testimony.  Did you

12    immediately -- did you get out of your vehicle

13    right away?

14    A.    Yes, I got out of my vehicle exactly when

15    he told me.  I came out.  He throwed the gun at me.

16    I had my hand up.  And I had my door open and was

17    stepping -- was stepping out, and he -- one of them

18    ran into it, and I pulled up -- pulled my foot up

19    in time.  He would have mashed it if I had left it

20    out there.  He backed off of it and opened the

21    door, and I just politely got on out and laid on

22    the ground, because I know -- I didn't want them to

23    just kick me or do nothing like that, because I

24    know they'll do it.

25    Q.    All right.  So, you heard testimony also

1    that Officer Koerner said that he found a bag in

2    your -- in your truck.  What is your response to

3    that?

4        A.    After they arrested me and picked me

5    up -- they picked me up and put me in the back of

6    the patrol car.  I'm sitting on the passenger side

7    in the back.  My car is facing me.  I know they got

8    the cameras up there.  They -- they got the camera

9    of everything what's going on.  I'm looking at it.

10   All the officers come around, was on the passenger

11   side of my vehicle.  And I don't know did they --

12       Q.    How many officers were -- what were they

13   doing?  Were they searching your vehicle?

14       A.    They didn't -- they weren't searching it

15   right then.  They opened my door and pulled --

16   started pulling my -- the panels off, the back and

17   the side -- both my -- all my doors in my vehicle.

18       Q.    Okay.  And you heard testimony -- you

19   heard testimony that this SouthTrust bag was found

20   in your -- by -- between the driver's seat and

21   the --

22       A.    Yes.  I didn't have -- I didn't rob

23   nobody.  I didn't have no bag in my vehicle.  He

24   planted that bag in my vehicle.  When I was sitting

25   down into the -- when I was sitting in the

1    officer's car, all of them come around there --

2    they've got the tape of it.  They've got the tape

3    of it.  I was -- you see all of them going around

4    there and just putting stuff in my vehicle.  I

5    works out of my vehicle.  That's why I have gloves.

6    I'm a plumber.

7         Q.    Okay.  How many pairs of gloves do you

8    carry around in your vehicle at any given time?

9         A.    I probably have six or seven.

10        Q.    Okay.

11        A.    I also have tools in the back of my truck

12   too.

13        Q.    Did -- you heard testimony also that they

14   found these bags.  Did you, at any time, while you

15   were riding in that area, did you throw anything

16   out of your window?

17        A.    No, I didn't.

18        Q.    And I asked you again -- let me ask you

19   this.  Have you been in trouble with the law?

20        A.    Yes, I have.

21        Q.    Did you -- have you ever done any time?

22        A.    Yes, I have.

23        Q.    You've been charged with robbery about,

24   what, twenty years ago, twenty-one years ago?

25        A.    Twenty-one -- twenty years ago.

1    Q.   Okay.  And you haven't been in -- you

2    have not been in any trouble since that time, any

3    convictions since that time?

4    A.   No, not in ten years.

5    Q.   And it is your testimony here today that

6    you did not go into the Arby's?

7    A.   I did not go in the Arby's.

8    Q.   And you did not have a gun with --

9    A.   I did not have a gun.  If I had a gun,

10    they could -- they can get fingerprints.  They can

11    take a DNA tests, do whatever they got to do.

12                    MR. DURANT:  Okay.  That's all,

13    Judge.

14                    CROSS-EXAMINATION

15    BY MR. POWELL:

16    Q.   Mr. Smith, I'm showing you State's 10.

17    That is your truck, correct?

18    A.   That's my vehicle.

19    Q.   Okay.  And you were in that that night?

20    A.   (No response.)

21    Q.   That's the car --

22    A.   Yes.

23    Q.   -- you were driving that night?

24    A.   Uh-huh.

25    Q.   Okay.  And you were in the vicinity of

219

```
 1    that Arby's?  You're not denying that?
 2         A.    I said, I come -- I was, what, two
 3    building over, because --
 4         Q.    Within two buildings --
 5         A.    Because I was at the BP service station.
 6    Right there at the BP service station, you got a
 7    McDonald's, then you got the Arby's.
 8         Q.    So Officer Johnson never saw you coming
 9    out of there holding --
10         A.    Didn't never see me coming out of there
11    holding nothing.
12         Q.    Going to your car?
13         A.    Going to my car.
14         Q.    Now, what were you wearing that night?
15         A.    I had on a pair of blue jean pants, Fubu
16    pants and a -- a slip over shirt.
17         Q.    What kind of slip over shirt?
18         A.    It was that hospital shirt.
19         Q.    A green hospital scrub shirt?
20         A.    Yes.
21         Q.    The same kind the person inside the
22    Arby's was wearing?
23         A.    Yes.
24         Q.    Now, is this a picture of you that night?
25         A.    Yes.
```

1        Q.   And did you have a mustache that night?

2        A.   Yes.

3        Q.   And you shaved that off since then?

4        A.   Uh-huh.

5        Q.   So you don't look the same here today,

6  obviously, as you do in this photograph?

7        A.   No.

8        Q.   Now, when the police got behind you,

9  y'all did go through Gunter Park; is that right?

10       A.   Yeah.

11       Q.   You don't deny anything the officers said

12  about chasing all through Gunter Park and

13  everything like that, the route y'all --

14       A.   No, I don't deny -- the only thing I

15  said, I said, ain't no man -- ain't no woman --

16  nobody going to ride through Gunter Park doing

17  eighty miles an hour or sixty miles an hour on that

18  back road.

19       Q.   So this white jeep would have gone in the

20  proximity of where they found these two items in

21  the road?

22       A.   I don't know.  I don't know.  I didn't

23  have -- it wasn't mine.

24       Q.   Okay.  And the white jeep would have gone

25  in the vicinity of where they located the bank bags

1    on the side of the road?

2        A.    I don't know.

3        Q.    Now, have you ever seen any of these bank

4    bags before?

5        A.    No, I haven't.

6        Q.    Never even laid eyes --

7        A.    Are my fingerprints on them?  Are my

8    fingerprints on them?

9        Q.    Are these your gloves?

10                THE COURT:  Listen to his question

11    and just answer it.  If your attorney needs to

12    follow up something, he can.

13        Q.    Now, have you ever seen any of these bank

14    bags before?

15        A.    No -- no, sir.

16        Q.    Would your fingerprints be on these bank

17    bags?

18        A.    I don't know, sir.  I've never seen them.

19        Q.    Are these your white gloves?

20        A.    Yes, sir.

21        Q.    And you don't deny these white gloves

22    were in your jeep?

23        A.    I got -- I should have about six or seven

24    pair in there.

25        Q.    Now, if somebody is wearing these gloves

1    and they touched these bank bags, is that going to

2    leave any fingerprints?

3         A.    I don't know.  I'm not an officer.

4         Q.    Now, have you ever seen State's 16

5    before?

6         A.    No.

7         Q.    So you've never seen this mask?

8         A.    No.

9         Q.    Do you know who cut these eye holes in

10   this mask?

11        A.    I don't know who did it.

12        Q.    Do you know whose mustache was sticking

13   out from the mouth hole of this mask?

14        A.    No, I don't.

15        Q.    Do you know whose green hospital scrub

16   shirt was underneath this mask?

17        A.    No, I don't.

18        Q.    Did you win anything at the track that

19   night?

20        A.    No, I didn't, sir.

21        Q.    How were you planning on paying for the

22   skoal?

23        A.    I had four dollars and sixty cents in my

24   pocket.

25        Q.    Is that all the money you had?

223

1          A.    That's all I had.

2          Q.    Did you make a decision that night that

3     maybe you needed some more money?

4          A.    No.

5          Q.    You --

6          A.    I had enough to get some skoal.

7          Q.    Did you have enough to keep living on the

8     rest of the month?

9          A.    No.  I works.

10         Q.    When was your next payday?

11         A.    The following weekend.

12         Q.    Who do you work for?

13         A.    I work for Bradley Plumbing and Heating.

14         Q.    Bradley Plumbing --

15         A.    Right there on Hackle Drive where I

16    parked my vehicle at.

17         Q.    So you were parked by where you work?

18         A.    Exactly.

19         Q.    Now, did you park voluntarily or did you

20    park because --

21         A.    I just parked because -- I said in my

22    mind there ain't no since in driving or putting

23    nobody on no high speed chase.  I just stopped.

24         Q.    So let me get this straight.  Officer

25    Johnson is lying about seeing you outside the

224

1     building; is that right?

2         A.   Yes.

3         Q.   Okay.  They're lying about how fast you

4     were going?

5         A.   Yes.

6         Q.   They're lying about whether or not you

7     ran stop signs?

8         A.   Yes.

9         Q.   They're lying about that sheriff's deputy

10    cutting you off, right?

11        A.   I don't remember nobody cutting me off.

12        Q.   Okay.  Because you stopped voluntarily,

13    right?

14        A.   I was right there -- I was right there on

15    Hackle Drive and Oliver Road --

16        Q.   Okay.

17        A.   -- right there on the corner at a stop.

18        Q.   And it's your testimony that, despite the

19    fact that it's illegal and unethical and could get

20    one of the police officers fired, if not indicted,

21    he planted this evidence in your jeep to frame you

22    for committing this robbery?

23        A.   Yes.

24        Q.   Despite the fact that you were wearing

25    the same clothing and fit the same general

225

```
 1   description as the person everyone described?

 2        A.    That's me.

 3                   MR. POWELL:  Nothing further, Judge.

 4                   MR. DURANT:  No further questions,

 5   Judge.

 6                   THE COURT:  Okay.  You can step

 7   down.

 8                   (Witness excused.)

 9                   THE COURT:  Do you have any other

10   witnesses?

11                   MR. DURANT:  No, Judge.  We rest.

12                   THE COURT:  And are you going to

13   have any rebuttal?

14                   MR. POWELL:  No, Judge.

15                   THE COURT:  Okay.  At this time,

16   both sides have rested.  So when you come back in

17   the morning, the attorneys will make closing

18   arguments, and then I'll instruct you on the law.

19   I'm going to ask if you could be here at 8:30.  And

20   we'll get you in the jury assembly room.  And if

21   anybody at home asks you about the case, just say

22   the Judge said I can't talk about it.  So we'll see

23   you in the morning.

24                   (Out of the presence of the jury.)

25                   THE COURT:  Before y'all leave,
```

1     let's go back over jury charges --

2                    MR. POWELL:  Yes, Judge.

3                    THE COURT:  -- briefly.  I think I

4     understand the State's requesting circumstantial

5     and --

6                    MR. POWELL:  Circumstantial

7     evidence, robbery one, and the one on flight,

8     Judge.

9                    THE COURT:  Okay.  And, Mr. Durant,

10    you had indicated you'll want identification?

11                   MR. DURANT:  Yes.

12                   THE COURT:  And I don't know of

13    anything else that would be applicable .

14                   MR. POWELL:  I don't either, Judge.

15                   THE COURT:  Okay.

16                   MR. POWELL:  Have they rested for

17    the Record?

18                   MR. DURANT:  Yes, we rested.

19                   THE COURT:  They have rested and you

20    have too.

21                   MR. POWELL:  And did he renew his

22    motion?

23                   THE COURT:  Yeah, and do you want to

24    renew your motion?

25                   MR. DURANT:  Yes.

1      THE COURT:  And do you base it off

2   the same grounds?

3      MR. DURANT:  Yes, Judge.

4      THE COURT:  And, again, I've heard

5   the evidence, and I think a jury question is

6   presented, so I'm going to deny it.

7      (Off the Record discussion.)

8      THE COURT:  Bring him back out.

9   Mr. Powell, it came up, during the course of

10  testimony, that one of the officers' cars had a

11  video camera.  And I need to know, for the Record,

12  if the State's had the -- had the video in its

13  possession?

14      MR. POWELL:  I -- Your Honor, I

15  first heard of the video today.  I don't know if it

16  exists or if it's been recorded over or what the

17  status of it is.  It wasn't in my case file.  It

18  came out during conversations with the

19  detectives -- I mean with the patrol officers here

20  this morning, the Detective has it.  I have no idea

21  whether the police department has it or not.

22      THE COURT:  Well, it's never been in

23  the DA's possession?

24      MR. POWELL:  No, never been in my

25  possession.  And I was not aware of it until this

1    morning or until they started talking about it on

2    the witness stand.

3                    THE COURT:  Okay.  Well, it's in the

4    Record for whatever it's worth.

5                    MR. POWELL:  And I have no idea if

6    they still even have it or not.  I know how they

7    are about cycling through things and recording back

8    over.  If the Detective doesn't come impound it and

9    take it from them and that kind of things, I have

10   no idea.

11                   THE COURT:  Well, I don't either and

12   neither do they.

13                   MR. POWELL:  And it's not listed on

14   the impound sheet in my file.

15                   MR. DURANT:  Judge, just for the

16   Record, I will say that, you know, the officers

17   have an obligation to tell the District Attorney

18   about such evidence.  And the fact that they didn't

19   tell them, it's prejudicial to my client.  And --

20                   THE COURT:  Well --

21                   MR. POWELL:  Subject to the -- I

22   mean, we can attempt to get it, Judge.  I mean, I

23   know the defendant's claim was that there's

24   exculpatory material on that videotape, so I can

25   attempt to locate it in effort to, you know, in all

```
 1    judicialness.
 2                  THE COURT:  Why don't y'all be back
 3    at eight in the morning?  And anything else you
 4    want to say in that regard, we can take up then.
 5                  MR. DURANT:  Okay.  Thank you.
 6                  (Break for the day.)
 7                  THE COURT:  Yesterday, when we
 8    broke, a matter had come up about the video -- a
 9    videotape being used at the -- during or at the
10    scene of the crime.  And, Mr. Powell, you were
11    going to see what -- make some effort to see what
12    could be done in that regard.
13                  MR. POWELL:  First off, Judge, just
14    to clarify, when we're talking about a videotape at
15    the scene, we're not talking about an evidence
16    technician coming out and doing any type of crime
17    scene --
18                  THE COURT:  Correct.  This was from
19    a vehicle.
20                  MR. POWELL:  From a patrol vehicle
21    from their pursuit camera.  I believe it was
22    Officer Koerner that verified that his pursuit
23    camera was functioning on that night.  I then
24    contacted the case agent in the case,
25    Detective Butterbaugh and asked him to go back
```

230

1   through the course of events that night and go

2   through everything they had at the police station,

3   attempt to locate that videotape.  Detective

4   Butterbaugh is en route, and he can describe for

5   the Court fully his efforts to locate that tape.

6   But my understanding is they were able to locate a

7   tape from Detective Koerner that had been labled

8   4/27.  We're not sure whether any of that is the

9   tape or not, because this occurred on 4/28.  But

10  that tape had been -- had not been impounded but

11  had been recycled through the regular course of

12  police operations and no longer reflected any of

13  the actions of Officer Koerner on that tape.  It --

14  I think he said the date that was on it was August

15  and it was another officer on there.  So it had

16  been recycled, basically, and was never impounded.

17  for evidence whatever was on that tape.

18              THE COURT:  Do you want to put

19  anything on the Record now or wait --

20              MR. DURANT:  Judge, I'll put it now.

21  I just want to place on the Record the fact that

22  this -- this tape -- this purported tape came to my

23  attention while Officer Koerner was on the stand.

24  That's when my client told me that he knew that

25  there was a video -- a video camera in the car.

1    Because when he was placed in the patrol car, he

2    saw the video camera and -- calling to him and that

3    it was operative.  I didn't have any knowledge

4    prior to that time that there was a video camera

5    that was operating.

6                    THE COURT:  Okay.  Well, hopefully,

7    the Officer will be here --

8                    MR. POWELL:  In the next couple of

9    minutes, Judge.

10                   (Brief recess was taken.)

11                   MR. POWELL:  One other thing, Judge.

12   And it's the State's position that the officers

13   testified yesterday fully and completely to the

14   events that occurred that night.  And there has

15   been no predicate laid that there is anything on

16   that videotape other than what's been purported

17   that they testified to.  Based on Officer Koerner's

18   testimony of the events that occurred during the

19   pursuit and the scene, which all the other

20   officers, who have testified, same the -- exactly

21   the same thing.  And anything else, just disputed

22   fact of witness credibility for the jury.

23                   MR. DURANT:  Well --

24                   THE COURT:  Well, it concerned me

25   enough to see if the video could be located.  And,

```
1    again, for the Record, the DA did not have it and

2    was not aware of it until yesterday either --

3                    MR. POWELL:  Correct.

4                    THE COURT:  -- so --

5                    MR. POWELL:  And Detective

6    Butterbaugh can further explain the police

7    procedures that were or were not followed in this

8    videotape being recycled or whatever.

9                    MR. DURANT:  I just want to make it

10   clear, and maybe this is understood -- but I want

11   to -- just want to clarify it -- that does not --

12   the fact that -- the circumstances of which the

13   tape is not available does not preclude the defense

14   from arguing in closing --

15                   THE COURT:  No.  You can argue

16   anything that was presented as evidence during the

17   trial of the testimony.  And, of course, whatever

18   is said at this hearing would not be evidence.  I'm

19   doing it more for the Record, just to be sure that

20   there is not any evidence that needs to be --

21   available that needs to be turned over.

22                   (Brief recess was taken.)

23                   (In the presence of Detective

24                   Butterbaugh.)

25                   THE COURT:  Raise your right hand.
```

1          DETECTIVE C. J. BUTTERBAUGH

2       The witness, having first been duly sworn or

3    affirmed to speak the truth, the whole truth, and

4    nothing but the truth, testified as follows:

5                   THE COURT:  Go see what jurors are

6    here, if they're all here, and let them know -- go

7    ahead.

8                   MR. POWELL:  Do you want me to

9    question --

10                  THE COURT:  Yes.

11                  MR. POWELL:  Okay.

12                  DIRECT EXAMINATION

13   BY MR. POWELL:

14       Q.   Again, state your name for the Record?

15       A.   C. J. Butterbaugh.

16       Q.   Now, Detective Butterbaugh, yesterday

17   during testimony and as we were discussing the case

18   with the patrol officers, it came to our attention

19   that one of the patrol -- sorry -- one of the

20   patrol units, a video camera was operational; is

21   that correct?

22       A.   Yes, sir.

23       Q.   Describe, briefly, what kind of camera

24   we're talking about.

25       A.    It's an in car camera that's in a patrol

1     vehicle that focuses on the front of the car --

2     right in front of the windshield.

3          Q.   Okay.  Which patrol officers' car had

4     that camera operating?

5          A.   It was Officer Koerner.

6          Q.   Okay.  Now, yesterday afternoon, at the

7     Court's request, I contacted you, did I not?

8          A.   Yes, sir.

9          Q.   And did you attempt to locate any video

10    from that patrol car?

11         A.   Yes, I did.

12         Q.   And describe for the Court the results of

13    those findings.

14         A.   I was not able to locate a video.

15    Apparently, it was taken from Officer Koerner's car

16    and secured.  At which point, we found a videotape

17    that was labeled Koerner with the date, and after

18    putting it, we reviewed it and the date on the

19    video was in August of this year.  So, apparently,

20    the tape had been recycled.

21         Q.   Okay.  Now, what -- how does that purport

22    with operating procedures with the police

23    department?

24         A.   That's patrol procedure.  I'm not sure

25    how patrol usually does -- does that.  But it seems

235

```
 1        from -- once a tape is full or taken out of the

 2        video and secured, and then when another tape runs

 3        out, they'll find one and replace it.

 4              Q.    Is it standard procedure to recycle these

 5        tapes unless it's specifically impounded --

 6              A.    Yes, it is.

 7              Q.    -- for evidentiary purposes?

 8              A.    Yes.

 9              Q.    And was that done in this case?

10              A.    Yes, it was.

11              Q.    It was impounded in this case?

12              A.    No, it was recycled.

13              Q.    It was recycled in this case?

14              A.    Yes.

15              Q.    So we have no idea what was or wasn't on

16        the video other than what the officers testified

17        to?

18              A.    Yes.

19              Q.    Now, was there any intent, that you

20        became aware of through the course of attempting to

21        locate this, to destroy or alter the contents of

22        that videotape?

23              A.    No.

24              Q.    In other words, this was just a mistake?

25              A.    Yes, it appears.
```

236

1        Q.    And the only evidence again we have of

2   what may or may not have been on that videotape is

3   what people saw out there that night?

4        A.    Yes, sir.

5                  THE COURT:  Mr. Durant, do you have

6   any questions?

7                     CROSS-EXAMINATION

8   BY MR. DURANT:

9        Q.    Mr. Butterbaugh, is -- these videotapes,

10  are they ever reviewed?  Is there any reason -- any

11  particular reason that might dictate that they will

12  be reviewed?

13       A.    Yes, I imagine that there would be.

14       Q.    Okay.  And this particular case, you

15  didn't see any need to review or impound this tape?

16       A.    I, myself, no, I didn't --

17       Q.    Did you see the tape?

18       A.    No, myself, I didn't review it or impound

19  it, no.

20                  MR. DURANT:  That's all, Judge.

21                  THE COURT:  Any --

22                  MR. POWELL:  One more question.

23                     REDIRECT EXAMINATION

24  BY MR. POWELL:

25       Q.    So, as far as you know, just somebody

1    took the tape out of Officer Koerner's camera and

2    stuck it out on a shelf somewhere, and then it got

3    recycled?

4         A.    As best of my knowledge, yes.

5              MR. POWELL:   Nothing else, Your

6    Honor.

7              THE COURT:   Well, based on that, I'm

8    going to specifically find that there hasn't been

9    any evidence withheld from the defendant.  And it

10   appears to the Court that that would be a normal

11   operation.  So, we'll get the jury in just a

12   moment.

13        And are y'all ready on a worker's comp?

14              (Brief recess was taken.)

15              (In the presence of the jury.)

16              THE COURT:   You can be seated.

17   Yesterday, when we broke at the end of the day, you

18   know both sides have rested, and now the attorneys

19   will address you in open -- closing arguments.  And

20   the State goes first, then the defendant, and then

21   the State has an opportunity if they want to reply.

22   And then I'll charge you.

23        Are you ready?

24              MR. POWELL:   Yes, Your Honor.   May

25   it please the Court, Mr. Durant?

1          Members of the jury, good morning.  Thank you

2     for your attention yesterday.  The State and

3     Mr. Smith greatly appreciate the attention you paid

4     to the evidence in this case.  But, as you can

5     see -- and the State's position, this is a

6     straightforward case.  We have a situation where a

7     man dressd in a green scrub shirt with some

8     identifiable facial features; mainly, this bushy

9     mustache, goes into Arby's with a gun, lines up

10    three employees on their knees, threatening them

11    with a gun, holding the gun to their head while he

12    makes them open a safe and load bags of money, and

13    then runs out into a white jeep, and that results

14    in a police chase, where they catch him in that

15    jeep with bank bags from the robbery inside the

16    jeep.  And they have not only the physical

17    evidence, State's 19, but photographic evidence of

18    the way the evidence was found in the jeep.  And

19    there is no evidence, whatsoever, that anything

20    happened different from the way the patrol officers

21    said other than the defendant's testimony.

22         Now, the Court is going to tell you, you can't

23    just disregard the defendant's testimony.  But, as

24    jurors in this case, y'all are the sole judges of

25    the credibility.  Who are you going to believe in

1    this case?  Are you going to believe a story that

2    the defendant told you about officers planting

3    evidence and attempting to frame him?  Are you

4    going to believe the testimony of three scared Arby

5    employees when they describe a man the same size

6    and shape and build of the defendant wearing the

7    exact same clothes of the defendant with the exact

8    same facial features of the defendant and the exact

9    same car as the defendant's when property from the

10   robbery was found in the car.  All of the evidence

11   stacks up and points to the defendant beyond any

12   reasonable doubt.

13        And the Judge is also going to tell you, as

14   jurors, you can employ your good old fashion common

15   sense on what happened in this case.  Members of

16   the jury, this is simple.  He went in.  He stuck up

17   employees and he got caught red-handed because

18   Officer Johnson was right there in the area and

19   Trudale Jackson flagged him down.  He threw bank

20   bags out the window.  The police recovered the bank

21   bags, and he was caught with a bank bag still in

22   the car.

23        Now, I'm sure Mr. Durant is going to get up

24   here and talk to y'all about fingerprints or the

25   lack of fingerprints.  Well, members of the jury,

1    he was wearing gloves.  He's going to talk to you

2    about videotapes or where is the videotape from the

3    patrol car.  If -- you're the jury.  If you want to

4    decide the fact that the State didn't play a

5    videotape from the patrol car as reasonable doubt,

6    that's your prerogative to do so.

7         But to find that to be reasonable doubt, you

8    have to choose to not believe the testimony of

9    those police officers that told you what they saw

10   out there.  You have to question what they were

11   telling you to the extent where this video would

12   rise to the level to make you not believe that

13   Officer Koerner and Officer Butterbaugh found this

14   bank bag in the car and took this picture.  It just

15   doesn't make sense that they would put their career

16   and their livelihood and their reputation on a line

17   just to frame this one random defendant.  That

18   doesn't make any sense.  That's the story of a

19   desperate man, who robbed an Arby's and got caught

20   red-handed.

21        The State's evidence is simple and it's

22   overwhelming.  And, after you have heard all this

23   evidence, we've proven our case beyond a reasonable

24   doubt.  The testimony, the pictures, the physical

25   evidence, find Charles Smith guilty of armed

1    robbery.   Thank you.

2                     THE COURT:   Mr. Durant?

3                     MR. DURANT:   May it please the

4    Court, Mr. Powell?

5         That is the job that you're faced with this

6    morning.   That's the job that jurors are always

7    faced with, to ascertain the truth.   You've heard

8    both sides of the story.   And you've heard the

9    eyewitnesses.   And as I mentioned to you yesterday

10   morning -- and that's why I spent so much time to

11   underscore the importance of the presumption of

12   innocence because -- as I said to you, the

13   presumption of innocence still abides and it abides

14   until you go in there and you resolve this case one

15   way or the other.   And you have that at one end and

16   at the other end you have the question of

17   reasonable doubt.

18        Reasonable doubt.   And there is -- you know,

19   you sit here and you heard the testimony.   And if

20   there is anything that creates a reasonable doubt

21   in any of your -- in any of you, that's it -- any

22   of you, there are twelve of you, and you have to

23   reach a unanimous verdict in this case.   But I

24   suggest to you that if any one particular person

25   has found that there is a reasonable doubt, that's

1    enough.  That I have some doubt -- not just some

2    doubt, but a reasonable -- a reasonable doubt.

3         Now, you've heard -- you sat here and you

4    heard the eyewitness, and not one individual -- not

5    one -- and let me hasten to add that you cannot

6    blame them -- but not one individual was able to

7    conclusively identify -- identify my client, not

8    one single individual.  And if a person had a mask

9    or something fashioned into a mask or whatever, so

10   be it.  That could not identify him.  It is easy to

11   come out here and say after the fact that that

12   person looked like A or that person looked like B

13   or that person looked like C.  But I don't -- it is

14   my position that I don't -- I don't believe that a

15   mustache is as such a distinctive characteristic to

16   extrapolate that, okay, this person has a mustache

17   or this person is heavy set, so it must be you.

18   You just don't make those extrapolations.  You just

19   don't.

20        And the witnesses testified they were scared.

21   No question about that.  They were scared.  And who

22   wouldn't be under those circumstances?  And it's

23   for the very reason that they were scared that I

24   would undermine their ability to make a positive or

25   a partial -- or even a partial identification.  You

1    know, it's -- it's -- it's not unheard of.  But

2    studies have shown over and over again that

3    eyewitness identification is one of the weakest

4    form of identification, because you put people into

5    that situation, a gun, life being threatened.

6        The studies have shown that folks -- folks

7    are --

8                    MR. POWELL:  Your Honor, we're going

9    to object to Mr. Durant's references to these

10   studies that are outside the evidence.

11                   THE COURT:  I'm going to sustain.

12                   MR. POWELL:  Move to strike and ask

13   the Court to --

14                   MR. DURANT:  Well --

15                   MR. POWELL:  -- instruct the jury to

16   disregard.

17                   THE COURT:  Well, the jury has heard

18   the evidence.  And, of course, your verdict must be

19   based on the evidence presented in Court.

20       Go ahead.

21                   MR. DURANT:  We submit that when

22   someone is faced with a gun that it detracts on

23   that person's ability, as I said, to focus on

24   facial features, and, especially, when those

25   features are covered.

1        You heard Mr. -- you heard Mr. Smith testify,

2    and he said that he was coming from the dog track.

3    And the Judge is going to instruct you, you're the

4    ultimate Judge of this testimony.  But the Judge is

5    going to instruct you that you can't disregard his

6    testimony.  You have to put his testimony with the

7    other witnesses and you have to weigh that

8    testimony.  You cannot say, Well, I don't believe

9    that.  And that is why I place so much emphasis on

10   the fact that whether you would believe police

11   testimony over a civilian or a defendant's

12   testimony.  His testimony is entitled to be weighed

13   equally with the other testimony in this case.

14        And he testified that there was a car behind

15   him.  And this car -- and you heard that testimony,

16   so I don't think that there is any disparity here

17   in as far as the testimony is concerned.  He

18   testified that the car was behind him.  The Officer

19   testified that he was following in an unmarked car.

20   This is not something that you can -- that anyone

21   would know -- maybe another police officer can

22   determine that oh, there goes a K-9 unit.  But the

23   regular civilian population is not attuned to that

24   unless, of course, they see the dog in the back of

25   the car, and you might reach that conclusion.

1       But he was following, and he said he was

2   afraid.  Well, you know, again, this is something

3   you're going have to use your common sense.  If

4   somebody -- if you had not done anything and

5   somebody is following you, who wouldn't be afraid?

6   Who wouldn't be afraid if a car is following them

7   for miles and miles?  Those are things that you

8   have to take into consideration.  I mentioned that,

9   because even after the -- the patrol units got

10  involved, here is a person who is already

11  petrified, is in a desolate area, it's after

12  midnight, and he doesn't know what is going to

13  happen.

14      And this -- and this chase -- this pursuit

15  ensues.  He didn't stop, and he told you why he

16  didn't stop.  Now, you and now me, we might have

17  stopped.  You know, you might -- people make

18  different decisions, different judgments when

19  they're faced with these situations.  But the fact

20  is he said that he didn't have any insurance, that

21  his license had been suspended in the past, and he

22  didn't want to -- to be faced with the same

23  situation.  And now you might -- you might very

24  well look at that and say, Oh, I don't know about

25  that.  But, again, that was his judgment.  That was

1    his experience.  That's his experience.

2       Now, some of you would probably never have

3    that kind of experience.  The police are after you

4    and you stop and you give them everything and you

5    cooperate.  But some people, because of their

6    experiences, don't do that.  And I'll leave that up

7    to you to make that final determine -- that final

8    determination, whether that was reasonable.  You

9    have to look at it in its totality.

10       You've already -- you -- I might jump around a

11    little bit in this closing -- but you heard the

12    testimony about the ceiling.  And you heard one

13    Officer testify that there was debris around and

14    there were -- there was a footprint.  You know, my

15    position is this.  If you are going to do a

16    thorough job -- and I believe that the Montgomery

17    Police Department, for the most part, does a good

18    job -- but if you're going to do a thorough job,

19    you're going to take everything -- everything,

20    because this is a serious charge.  You're going to

21    take everything, and you're going to lift

22    footprints, and you're going to, you know --

23    purportedly, they got the person that did this as

24    far as they were concerned -- so, purportedly, he

25    still had on the same shoes, so don't look at

```
1     things you're going to do.
2          If you can't -- if -- if -- the position of
3     the police department is that he had on gloves,
4     and, therefore, you couldn't lift any fingerprints.
5     You saw -- and it's -- this case is clear that he
6     saw an impression on a piece of sheetrock, so lift
7     that footprint.  You know, they can do it and
8     compare it to the shoes that the -- the alleged
9     defendant was wearing.  That's simple.  I asked the
10    detective -- you heard me ask him -- he said that
11    wasn't necessary.  But I don't -- I don't see why
12    that wasn't necessary.  It's a cumulative -- a
13    cumulative impact of evidence that makes the
14    difference.  Evidence stacked upon evidence.  It's
15    never too much.  And you heard the defendant
16    testify, he said, Well they -- they converged upon
17    you.  Well, that's the judgment of police.  I
18    think -- I don't know know about any problems with
19    that.  They converged upon me.  And they -- even
20    one incident, they almost came to slamming the door
21    on his foot.  And he said that that's the reason he
22    did not get out of the car immediately.  That's
23    believable.  That's believable.  Because when --
24    when they -- when they come upon you, you know,
25    they have their fears too, and they're not being
```

1    nice about it.  They're not being nice about it.

2         Officer -- Officer Koerner testified -- and

3    you heard me ask him, he said he had a video

4    camera.  And the video camera -- asked him if the

5    video camera was operative, and he said, yes, it

6    was operative.  And I would imagine that a video

7    camera caught something -- caught something of this

8    chase.  You know, you heard that this chase was

9    eighty miles -- eighty-five, ninety sometimes.  And

10   you heard my client testify, and I think -- I think

11   it's believable.  You can't -- you know, he matter

12   of factly said, you couldn't be driving no ninety

13   miles an hour in that area.  And you heard him also

14   testify that the turns were not exactly ninety --

15   ninety-degree turns, but at least eighty to

16   eighty-five.  And if somebody is going eighty or

17   ninety miles an hour, you know, I believe those

18   cars are going to turn over.  And then he sustained

19   speed, going -- making those kind of turns.  So

20   you -- it's questionable whether the car was going

21   that fast.  It's questionable.

22        One officer testifies when he saw the car, it

23   was within the speed limit.  But another officer,

24   prior to that testimony, testified that it was

25   above the speed limit, the officer who was in the

1    unmarked car said it was above the speed limit and

2    testified that he was running stop signs.  Well,

3    you know, again, that's up to you to determine,

4    rather that my client said, No, I didn't run any

5    stop signs.  It's up to you to determine that.

6         The -- the situation with what the defendant

7    was wearing, you know, sometimes there are

8    situations -- and I think we all -- and that's why

9    you've got to use your common sense.  I think we

10   all experience situations where you say, Wow, if

11   that -- if it weren't for so and so, I could have

12   been -- this could have happened, because it was so

13   incoincidental that I was there and I was -- I was

14   wearing this or I was doing this.  You know, it

15   happens.  It happens.  We don't know really -- I

16   wasn't there.  You weren't there.  But you've got

17   to make a decision.  We don't know really what

18   happened after whoever robbed the place.  What

19   happened when that person left the back door, we

20   don't know.  But it would -- but it seems to me

21   that it took some time before this person

22   supposedly pulled off from the parking lot.  From

23   the testimony I heard, I believe I could conclude

24   reasonably that that person would have been long

25   gone.  Folks don't dillydally when they've

250

1    committed a robbery.  They get out there and they

2    get it and they're gone.  You know, most of the

3    times they have a person waiting for them ready to

4    pull off.  But, you know, you've got to put it in

5    context.  And you can't disregard his testimony

6    because he's the defendant, and he might seem

7    guilty to you.  Worse things have happened and

8    people have not been guilty.

9         Now, they had a -- two officers testified

10   about the video being operative, but Officer

11   Butterbaugh and Officer Koerner, who was the driver

12   of that patrol car, said it was operative.  Again,

13   I say just like the footprint, bring -- bring that

14   tape in here.  Bring that tape in here.  It was

15   operative.  Nobody said, Well, you know, it was

16   turned off.  The defendant testified that he could

17   look at it and see that it was operating.  You

18   know, you've got to bring -- you've got to bring --

19   you've got to wrap a case up.  You can't do -- you

20   cannot do it, you know, halfheartedly and said,

21   Well, this is enough and this -- you know, this is

22   what -- convict him.  You've got to do everything

23   in your investigation.  That's the way you

24   should -- so that your decision today -- your

25   decision today would be made easier.  If you could

1    look at the videotape showing the chase and,

2    possibly -- I am not saying this conclusively --

3    but, possibly, showing that something being thrown

4    from the window.  This car is behind.  The

5    camera -- the camera aims in that direction.  So it

6    would -- it would have reflected.  I'm not saying

7    that it -- that it was a must, but it would have

8    reflected maybe something.  You know, you see -- if

9    you saw that, I wouldn't be making this argument to

10   you this morning, because you could easily say,

11   Yes, I saw something thrown.  I don't know what it

12   was.  I saw this chase, and, therefore, this is

13   what happened.

14        You know, I don't stand here before you today

15   and condone any robbery.  It is -- it is awful that

16   they have to endure what they endured.  But, at the

17   same time, it's incumbent on the police officers to

18   get the right person.  It is incumbent.  And

19   there's enough doubt in this case, you know,

20   debris.  The fellow who cleaned up the bathroom

21   said he didn't see anything.  The officer

22   testified, yeah, there was sheetrock down on the

23   floor.  I think there's even a question as to what

24   was going on when -- you know, where this person

25   came from.  They said they went into the

1  bathroom -- Oh, well, I guess -- of course, they'll

2  say that the person must have been up in the

3  ceiling, because they didn't see anybody in the

4  bathroom.

5        The defendant testified he didn't have -- they

6  retraced the steps, and you heard all about that.

7  They went in there and found some bags.  We don't

8  know when those bags got out there.  We don't know

9  who preceded my client in that area.  One bag was

10  found in the car -- in the truck.  The defendant

11  said he didn't know anything about the bag.  And,

12  obviously, you could say that about folks and say,

13  of course, he'll say that.  And I'm not, you know,

14  going to pay any attention -- you know, if that's

15  your conclusion, I can't -- I -- it's too bad I

16  can't convince you otherwise.  But I don't think

17  it's far-fetched.  I don't think it's far-fetched.

18        And you have to use your common sense.  You're

19  going to have to use your everyday knowledge about

20  what goes on in police investigations.  You're

21  going to have to do it.  Now, some people has got

22  different -- some people have different

23  experiences, and they'll probably say, huh-uh.

24  Because if your experience is different, of course,

25  your conclusion in this case would be different.

1    If your experience is, you know, folks don't do

2    this and folks don't do that.  But it happens.  And

3    all I ask you is to give it a fair hearing.  I ask

4    you not to summarily just say huh-uh.  Police

5    officers don't do this and police officers don't do

6    that, because, you know, it happens.  It happens.

7        I ask you to really consider the things that I

8    have discussed with you here this morning.  I think

9    if you'll approach it in the manner that I have

10   delineated, I think that you would find that

11   there's reasonable doubt -- reasonable doubt in the

12   sense that there is no firm eyewitness

13   identification.  The Judge is going to tell you

14   about eyewitness identification -- which is another

15   thing I want you to pay close attention as the

16   Judge instructs you is circumstantial evidence --

17   circumstantial evidence.  You can be convicted on

18   circumstantial evidence, but, please, pay close

19   attention to what the Judge says when she gives the

20   instruction of circumstantial evidence and how it

21   must preclude any other inference.  Listen to that.

22   And I think if you listen to that and have an open

23   mind -- and that's why I ask you to keep an open

24   mind -- and you have an open mind, I don't think

25   you're going to have any problem in returning a